CENTER FOR BIOLOGICAL
DIVERSITY, et al.,
Plaintiffs,

v.

Gale NORTON, Secretary of the
Department of the Interior,
Defendant.

No. CV 01–409 TUCDCB.

United States District Court,
D. Arizona.

Jan. 13, 2003.

Matthew Gilbert Kenna, Kenna & Hickcox, PC, Durango, CO, Neil Levine, Denver, CO, for plaintiffs.

Seth M. Barsky, Jason T. Cohen, U.S. Dept. of Justice, Wildlife & Marine Resources Section, Washington, DC, for defendant.

## ORDER

BURY, District Judge.

Pending before this Court is Plaintiffs' Motion for Summary Judgment, as well as Defendant's Cross–Motion for Summary Judgment. For the reasons set forth below, Plaintiffs' Motion for Summary Judgment is granted and Defendant's Cross–Motion is denied.

## INTRODUCTION

### I. General Overview

This lawsuit arises out of the Fish and Wildlife Service's ("FWS") designation of critical habitat for the Mexican spotted owl (*Strix occidentalis lucida*) under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.* FWS, after a series of lawsuits and court orders, designated 4.6 million of a proposed 13.5 million acres of critical habitat in Arizona, Colorado, New Mexico, and Utah. 66 Fed.Reg. 8530. FWS designated only 4.6 million acres, excluding nearly all federal and tribal lands in Arizona and New Mexico, upon determining that adequate management plans already existed on those lands. *Id.* at 8542–8543. With respect to the lands of the San Carlos Apache Tribe, even though there was no complete management plan, FWS decided to exclude such lands from its critical habitat designation on the bases that the management plan was nonetheless adequate and that the benefits of such exclusion outweighed the benefits of any designation. *Id.* at 8545.

Plaintiff brought the present suit to enjoin Defendant, through the FWS, from excluding from the spotted owl's critical habitat nearly 9 million acres of federal and tribal lands in Arizona and New Mexico. Plaintiff argues that FWS' designation violates the ESA as well as the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Defendant argues that its critical habitat designation for the spotted owl is legally sufficient and in full compliance with both the ESA and the APA.

## II. BACKGROUND AND PROCEDURAL HISTORY

This is not the first lawsuit arising out of FWS' duty to designate critical habitat for the Mexican spotted owl. To the contrary, numerous lawsuits have been litigated against FWS and the Secretary of the Department of the Interior in order to compel compliance with the ESA.

In a previous suit brought by Plaintiff against Defendant's predecessor and FWS, the District Court for the District of New Mexico provided a "brief chronology summariz[ing] Plaintiff['s] valiant and persistent attempts to extend federal protection to the Mexican spotted owl. Equally important, the chronology also evidences years of delay relating to FWS' compliance obligations." *Southwest Center for Biological Diversity v. Department of Interior ("DOI")*, CV 99–519 LFG/LCS–ACE (D.N.M.) (Plaintiff's Attachments, p. 101.)

In December 1989, FWS was petitioned to list the Mexican spotted owl as either an endangered or threatened species under the ESA. (*Id.*) On March 16, 1993, nearly four years later, FWS published its final rule designating the owl as a threatened species. 58 Fed.Reg. 14248. (*Id.*) In its final rule, FWS noted that it was prudent to designate critical habitat for the owl, but that such habitat was not determinable. (*Id.*) Subsequently, FWS began gathering data in preparation of designating the owl's critical habitat. However, by February 1994, nearly a year after designating the owl as threatened, FWS had not published any proposed rule regarding critical habitat designation. (*Id.*)

In February 1994, a lawsuit was filed in the District Court of Arizona seeking to compel FWS to designate critical habitat for the Mexican spotted owl. *Silver v. Babbitt,* CV 94–337–PHX–CAM. (*Id.* at 102.) On October 6, 1994, the court ordered FWS to publish a proposed rule in the Federal Register by December 1, 1994, proposing critical habitat for the owl. The court further ordered that the final rule designating critical habitat was to be published no later than May 30, 1995. (*Id.*) FWS missed the December deadline and on December 7, 1994, the court ordered FWS to comply with the court's earlier order. Nevertheless, FWS .attempted to delay final publication of critical habitat designation for the owl, which the court rejected on May 10, 1995 and again ordered FWS to comply with the court's order. (*Id.*) However, FWS did not publish its final rule designating critical habitat for the Mexican spotted owl until June 6, 1995. 60 Fed.Reg. 29914. (*Id.*)

FWS revoked its critical habitat designation for the owl on March 25, 1998 (63 Fed.Reg. 14378) in response to the ruling in *Coalition of Arizona/New Mexico Counties v. United States Fish and Wildlife Service,* CV 95–1285–M (D.N.M.). (*Id.*) The court in *Coalition* enjoined FWS from enforcing the critical habitat designation until it completed review required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. 4321, *et seq.* (*Id.*) However, it took over a year after the injunction to revoke the critical habitat designation. (*Id.*) Thereafter, FWS took no further action to comply with NEPA or to fulfill its obligations under the ESA to properly designate critical habitat for the Mexican spotted owl. (*Id.*)

As a result of FWS' inaction, yet another lawsuit was required and filed in the District Court of New Mexico. *Southwest Center supra.* (*Id.*). In that case, FWS conceded that it was in violation of the ESA for its failure to timely designate critical habitat for the Mexican spotted owl. *Id.* However, despite the passage of seven years since the designation of the owl as threatened, and having already designated critical habitat once (which was later revoked), FWS requested an additional 18 to 24 months to comply with the ESA.

The court found FWS' request unreasonable, particularly in light of FWS' prior ability to designate critical habitat in less than three months, after a court order. *Id.* In that situation, FWS was faced with designating critical habitat for more than one species in a short period of time. The court noted that, unlike the previous situation, "the Mexican spotted owl habitat designation involves only one species, the habitat is primarily on National Forest lands as opposed to mixed private and public lands, and FWS has the benefit of a prior critical habitat designation so that it will not have to start completely from scratch." *Id.* Accordingly, the court ordered FWS to publish its final rule designating critical habitat for the Mexican spotted owl by January 15, 2001. *Id.*

As a result of the court order, FWS published its Proposed Rule designating critical habitat for the owl on July 21, 2000. 65 Fed.Reg. 45336. In its Proposed Rule, FWS proposed designating approximately 13.5 million acres of critical habitat in Arizona, Colorado, New Mexico, and Utah, largely on federal land. *Id.* FWS noted that 91 percent of all Mexican spotted owls known to exist in the United States do so on land administered by the United States Forest Service. *Id.* at 45337. Most of those owls exist in Arizona and New Mexico, including 11 National Forests. *Id.* Indeed, 55.9 percent of the entire U.S. population of Mexican spotted owls exist through central Arizona and west-central New Mexico. *Id.*

In its Proposed Rule, FWS acknowledged that it "may exclude areas from critical habitat designation if [it] determines that the benefits of exclusion outweigh the benefits of including the areas as critical habitat, provided the exclusion will not result in the extinction of the species." *Id.* at 45339. FWS also noted that a critical habitat designation "identifies areas that may require special management or protection." *Id.* However, no mention is made of excluding an area from critical habitat if another management system is in place.

According to FWS, the proposed critical habitat areas, including federal and tribal lands in Arizona and New Mexico, "are essential to the conservation" of the owl. *Id.* at 45340. In fact, it was the belief of FWS that "Mexican spotted owl conservation can be best achieved by management of Federal and Tribal lands." *Id.* at 5341. As a result, FWS' proposed critical habitat designation included 4.9 million acres in Arizona and 4.6 million acres in New Mexico, all of which were on federal and tribal lands.[1] *Id.* at Table 1. The Proposed Rule indicated 37 critical habitat units in Arizona and 31 in New Mexico. *Id.*

In its Proposed Rule, FWS indicated that it would reconsider designating critical habitat on tribal lands of the Navajo Nation and the Mescalero Apache upon the Tribes' submission of management plans. *Id.* at 45344–45. The FWS indicated it would reevaluate the need to designate critical habitat on those lands in light of the Tribes' management plans. *Id.* FWS proposed excluding certain lands of the San Carlos Apache and further indicated that it might exclude more upon the San Carlos Apache's completion of its management plan. *Id.* at 45345. FWS

also proposed excluding critical habitat on the tribal lands of the White Mountain Apache and Jicarilla Apache as both Tribes already had owl management plans in place. *Id.* According to FWS, these lands were not in need of special management or protection and, therefore, did not meet the definition of critical habitat. *Id.*

FWS published its Final Rule designating critical habitat of the Mexican spotted owl on February 1, 2001. 66 Fed.Reg. 8530. In its Final Rule, FWS again noted that 91 percent of all Mexican spotted owls known to exist in the United States do so on Forest Service lands. *Id.* Nevertheless, FWS excluded all FS lands in Arizona and New Mexico (constituting over 7 million acres) from its critical habitat designation since those lands were already governed by FS' Forest Plans. *Id.* at 8542–8543. The Final Rule also excluded the tribal lands of the White Mountain Apache and Jicarilla Apache as FWS indicated it would in its Proposed Rule. In excluding federal and tribal lands from the Mexican spotted owl's critical habitat FWS reasoned that "[a]dditional special management is not required if adequate management or protection is already in place." *Id.* at 8543.

With respect to the San Carlos Apache, FWS noted that the San Carlos Apache submitted a draft management plan in September 2000, which FWS deemed consistent with its own Recovery Plan. *Id.* at 8545. FWS also noted the San Carlos Apache's previous management plans, as well as its comments and opinions regarding the conservation of the Mexican spotted owl. *Id.* Explaining that the ESA provides for the exclusion of lands from critical habitat if the benefits of exclusion outweigh those of inclusion, 16 U.S.C.

---

1. There appears to be a typographical error in Table 1 of the Proposed Rule. In Table 1, Arizona and New Mexico are listed as both having 4.6 million acres of critical habitat.

However, upon tabulating the individual numbers for each state, 4.9 million acres occur in Arizona while 4.6 million acres occur in New Mexico.

§ 1533(b)(2), FWS determined that all lands of the San Carlos Apache were excluded from critical habitat designation. As FWS explained:

> In light of this and the fact that the Tribe will soon have their management plan completed, we find that the designation of critical habitat will provide little or no additional benefit to the species. The designation of critical habitat would be expected to adversely impact our working relationship with the Tribe and we believe that Federal regulation through critical habitat designation would be viewed as an unwarranted and unwanted intrusion into tribal natural resource programs. Our working relationships with the Tribe has (sic) been extremely beneficial in implementing natural resource programs of mutual interest.

*Id.*

The end result of FWS' Final Rule was the exclusion of nearly 70 percent of the critical habitat considered in the Proposed Rule. Whereas FWS proposed designating 4.9 million acres in Arizona as critical habitat, it actually designated only 830,803 acres, 16 percent of the proposed designation. Likewise, FWS proposed designating 4.6 million acres in New Mexico but actually designated only 53,747 acres, 1 percent of the proposed acreage. *Id.* at Table 1. While the Proposed Rule proposed 37 critical habitat units in Arizona and 31 in New Mexico, the Final Rule designated only 11 and 6, respectively. *Id.*

Plaintiff filed the present lawsuit on August 27, 2001.

Like FWS' history of delay in designating critical habitat for the spotted owl, the history behind FS' Forest Plans, a.k.a. Land and Resource Management Plans (LRMP), evidences FS' own disregard of court orders and the ESA. *Precision Pine & Timber, Inc. v. United States,* 50 Fed. Cl. 35 (2001). At issue in *Precision Pine* were timber sale contracts in Arizona issued by FS between 1990 and 1995. *Id.* at 38. In 1995, the Arizona District Court ordered the suspension of the contracts based upon FS' failure to submit its Forest Plans for ESA-required consultation with FWS upon the listing of the Mexican spotted owl as a threatened species. *Id., citing Silver v. Babbitt,* 924 F.Supp. 976 (D.Ariz.1995). In fact, FS attempted to prevent the owl's listing "by various means, including: revising its forest management guidelines by means of non-binding directives, disputing FWS findings in the press, and beginning the process of preparing a new conservation strategy to be included in the Region 3 Forest Plans."[2] *Id.* at 41–42.

Despite FS' above efforts to prevent the owl's listing, the Mexican spotted owl was listed as a threatened species on March 16, 1993. *Id.* at 42; 58 Fed.Reg. 14,248. One of the factors considered by FWS in listing the spotted owl as endangered was "the present or threatened destruction, modification, or curtailment of habitat or range." *Id.*

Under this factor, timber harvest practices in New Mexico and Arizona were listed as a primary contributor to the Mexican spotted owl's listing as a threatened species along with other human activities and natural causes. In response to comments received regarding the proposed listing, the FWS took the position that the Forest Service's LRMPs in Region 3 were not adequate

---

**2.** Region 3 of the Forest Service is the Southwest Region, which encompasses all of Arizona and New Mexico.

to assure the protection of the Mexican spotted owl.

*Id.*

In response to the owl's listing, FS did not submit any of its existing Forest Plans (LRMPs) in Region 3 for formal consultation with FWS, even after receiving a Notice of Intent to Sue (NOIS) if it failed to do so. *Id.* at 42–43. On April 1, 1994, FWS publicly stated its position that FS' Forest Plans in Region 3 were inadequate to protect the Mexican spotted owl. *Id.* at 43; 59 Fed.Reg. 15361. Indeed, FS itself "believed that the existing LRMPs themselves did not provide adequate protections for the Mexican spotted owl." *Id.* at 44. Rather than submit its Region 3 LRMPs for consultation, however, FS decided to amend them in order to provide "management direction for the Mexican spotted owl." *Id.*

In August of 1994, FS and Defendant's predecessor were sued in the District Court of Arizona for FS' decision to harvest timber under existing Forest Plans prior to completing formal consultation with FWS regarding the listing of the spotted owl as threatened, in violation of the ESA. *Id.* at 45. Even after these lawsuits were initiated, and in direct opposition to legal advice from the Department of Justice, FS still opposed submitting its Forest Plans for consultation. *Id.* Even after negative action against FS by the United States Supreme Court, instead of submitting its existing Forest Plans for consultation, FS issued its revised notice of intent to amend those Plans. *Id.* at 46; 60 Fed.Reg. 25884.

It was not until July 1995, that FS sought to initiate ESA consultation on its *amended* Forest Plans, but not on its *existing* Plans. *Id.* However, the District Court of Arizona ordered FS to immediately commence re-consultation on its existing Forest Plans, and suspended all timber harvesting in Region 3. *Id., citing*

*Silver v. Babbitt,* 924 F.Supp. at 989. Shortly after this order, FS stipulated to complete consultation with FWS, among other things. *Id.* FS' re-consultation with FWS, however, was not completed until December 1996. *Id.* at 47–48.

On April 2, 1996, prior to completing re-consultation in December 1996, FS released two draft Biological Opinions prepared by FWS, "ostensibly one for existing LRMPs and one for amended LRMPs." *Id.* at 48. On May 3, 1996, however, the District Court of Arizona ordered that the April 2, 1996 Biological Opinions were legally insufficient and in direct violation of the court's prior order. *Id.* at 49. On July 12, 1996, FWS issued a final Biological Opinion to FS, stating "that continued implementation of the existing forest plans will jeopardize the continued existence of the Mexican spotted owl and will adversely modify the species' critical habitat." *Id.* (internal quotations omitted).

In response to the July 12, 1996 Biological Opinion, FS sent a letter to FWS wherein it unilaterally asserted that the existing Forest Plans were compliant with the Biological Opinion and that FS had completed the consultations required by the ESA and the order of the District Court of Arizona. *Id.* Additionally, FS filed the Biological Opinion with the District Court of Arizona and declared that it was lifting the logging suspensions "notwithstanding the court's explicit reservation of jurisdiction to enforce the terms of the joint stipulation." *Id.* FS also issued a press release declaring that it would unilaterally resume logging in Region 3 on July 15, 1996. *Id.* at 49–50.

In response to an emergency petition regarding FS' unilateral decisions, the District Court of Arizona ordered on July 16, 1996, that FS could not lift the logging suspensions without a court order. *Id.* at 50. In that order, the court commented that FS delayed resolution of the situation

through its "inappropriate procedures." *Id.* On September 17, 1996, the court ordered that the re-consultations were incomplete and that the Biological Opinion on the existing Forest Plans was legally deficient in three of four required areas. *Id.* Finally, on November 26, 1996, FS delivered a new final Biological Opinion which the court deemed legally sufficient and signaled the end of the consultation process. *Id.* at 51.

Despite their legal sufficiency, FS' Forest Plans, which provided the sole basis for FWS' exclusion of all FS lands in Arizona and New Mexico from critical habitat designation, have either not been implemented at all or have been implemented improperly. In *Forest Guardians v. United States Forest Service,* the District Court of Arizona noted that FWS established its Spotted Owl Recovery Plan in December 1995, wherein FWS found that grazing, rather than logging, threatened the survival of the Mexican spotted owl. *Forest Guardians v. United States Forest Service,* CV 00–612–TUC–RCC (Oct. 17, 2002), p. 2. In response, FS amended its Forest Plans for the eleven national forests in the Southwest Region (Region 3) to require monitoring to ensure that grazing use in those areas did not exceed "forage utilization standards" during the growing season. *Id.* at 3. As required under the ESA, FS consulted with FWS regarding its amendments to ensure the amendments would not adversely affect the owl. In its Biological Opinion, the FWS determined that the amended Forest Plans would comply with the ESA, but that the old Forest Plans did not. The old Forest Plans would only be compliant upon implementation of the 1996 amendments. *Id.*

The court found that during ESA consultation, both FS and FWS assumed that FS' amendments would be immediately implemented. However, FS failed to immediately implement the grazing standards contained in the 1996 amendments. One reason for this failure was an injunction entered against FS by the District Court of Arizona in a separate case which enjoined FS from implementing and enforcing the amended grazing standards. *Id.* at 11, *citing Arizona Cattle Growers Association v. Towns,* CV 97–1868 PHX–RCB (May 24, 2000). The court in *Forest Guardians* found that FS' failure to immediately implement the standards of the 1996 amendments required the re-initiation of Section 7 consultation under the ESA. *Id.,* at 11. As the court explained,

> While grazing may be only a small part of the overall recovery plan for the [Mexican spotted] owl, the Court finds that failure to implement new grazing standards not only in the interim period between the adoption of the amendments and site specific analysis, as anticipated by the Biological Opinion, but also the failure to implement new standards even at the time of renewal of grazing permits, are actions of the Forest Service which may effect the owl and its habitat. The Forest Service's failure to reconsult is therefore contrary to the provisions of the ESA and not in accordance with law as required by the APA.

*Id.* at 11.

Thereafter, on November 22, 2002, the District Court of Arizona ordered FS to re-initiate consultation with FWS, *Forest Guardians,* CV 00–612 TUC–RCC, Nov. 22, 2002. The court further ordered that if FS's re-consultation with FWS is not completed by January 22, 2003, all livestock grazing within certain Mexican spotted owl Protected Activity Centers (PACS) would be prohibited. *Id.*

## III. DISCUSSION

### A. Defendant's Interpretation of the ESA is Not Entitled to Deference.

At issue in this case is Defendant's interpretation of the ESA's definition of

"critical habitat." The ESA defines "critical habitat," in relevant part, as follows:

the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which *may* require special management considerations or protection . . . .

16 U.S.C. § 1532(5)(A)(i) (emphasis added).

In its final rule, Defendant sets forth its interpretation of the above definition. According to Defendant, an area is not considered "critical habitat" if "adequate management or protections are already in place." 66 F.R. 8530, 8537. To use Defendant's exact words,

[S]pecial management considerations or protection is a term that originates in the definition of critical habitat. Additional special management is not required if adequate management or protection is already in place. Adequate special management considerations or protection is provided by a legally operative plan/agreement that addresses the maintenance and improvement of the primary constituent elements important to the species and manages for the long-term conservation of the species. We use the following three criteria to determine if a plan provides adequate special management or protection: (1) A current plan/agreement must be complete and provide sufficient conservation benefit to the species; (2) the plan must provide assurances that the conservation management strategies will be implemented; and (3) the plan must provide assurances that the conservation management strategies will be effective, i.e., provide for periodic monitoring and revisions as necessary. *If all of these criteria are met, then the lands covered un-*

*der the plan would no longer meet the definition of critical habitat.*

*Id.* at 8543 (emphasis added). In short, according to Defendant, if existing management of an area is adequate, it is not critical habitat.

When a court reviews an agency decision, such as FWS' decision here, the standard for summary judgment is provided by 5 U.S.C. § 706(2), the Administrative Procedure Act ("APA"). *Environment Now! v. Espy,* 877 F.Supp. 1397, 1421 (E.D.Cal. 1994). "The question is not whether there is a genuine issue of material fact, but rather whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the records taken as a whole." *Id.* (citing *Good Samaritan Hospital, Corvallis v. Mathews,* 609 F.2d 949, 951 (9th Cir.1979)). The precise nature of judicial review of an agency decision is whether the issue is one of fact or law. *Id.* An agency's factual findings are entitled to "substantial deference." *Id.,* (citing 5 U.S.C. §§ 706(2)(A) & (E)). However, since courts are the final authorities regarding statutory interpretation, "legal issues, including questions of statutory construction, are reviewed *de novo.*" *Id.* (citing *Blackfeet Tribe v. U.S. Department of Labor,* 808 F.2d 1355, 1357 (9th Cir.1987)).

Nevertheless, in some circumstances, an agency's interpretation of governing statutes and regulations is entitled to deference. *Id.* (citing *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 847–48, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). Under *Chevron,* a two-step analysis is employed when reviewing an agency's statutory interpretation:

First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of

Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based upon a permissible construction of the statute.

*Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694.

The Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq.,* is intended to conserve threatened and endangered species, and "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved ...." 16 U.S.C. § 1531(b). Thus, one of the principal purposes of the ESA is to protect and conserve the habitat of endangered and threatened species. Indeed, as Plaintiff points out, the legislative history of the ESA evidences Congress' understanding that the preservation of a species' habitat is essential to the preservation of the species itself.

It is the Committee's view that classifying a species as endangered or threatened is only the first step in insuring its survival. *Of equal or more importance is the determination of the habitat necessary for the species' continued existence.* Once a habitat is so designated, the Act requires that proposed Federal actions not adversely affect the habitat. If the protection of endangered and threatened species depends in large measure on the preservation of the species' habitat, then *the ultimate effectiveness of the Endangered Species Act will*

*depend on the designation of critical habitats.*

H.R.Rep. No. 94–887, at 3 (1976) (emphasis added).

In creating the ESA, "Congress started from the finding that '[t]he two major causes of extinction are hunting and destruction of natural habitat.'" *Tennessee Valley Authority ("TVA") v. Hill,* 437 U.S. 153, 179, 98 S.Ct. 2279, 2294, 57 L.Ed.2d 117 (1978) (quoting S.Rep.No. 93–307, p. 2 (1973), *reprinted in* 1973 U.S.Code Cong. & Admin. News 2289, 2290). Of these two threats, "Congress was informed that the greatest was the destruction of natural habitat." *Id.* (citations omitted). It was recommended to Congress that all agencies responsible for land management "avoid damaging critical habitat for endangered species and to take positive steps to improve such habitat." *Id.* (internal quotations omitted; citation omitted). Consequently, one of the principal purposes of the ESA is to conserve the ecosystems upon which endangered and threatened species depend. 16 U.S.C. § 1531(b).

■ Here, Defendant's interpretation of "critical habitat" is nonsensical. The plain language of the ESA's definition of "critical habitat" includes habitat which *may* require special management. "May" is an auxiliary verb which expresses possibility. *The Concise Oxford Dictionary of Current English* (9th ed.1995). Put differently, "may" is "an auxiliary of predication" which expresses "objective possibility, opportunity, or absence of prohibitive conditions" and is similar to "can." *The Oxford English Dictionary* (2nd ed.2001). The phrase "which may require special management" can be rephrased as "can require" or "possibly requires" without altering its meaning. Hence, a plain reading of the definition of "critical habitat" means land essential to the conservation of a spe-

cies for which special management or protection is *possible.*

Whether habitat does or does not *require* special management by Defendant or FWS is not determinative on whether or not that habitat is "critical" to a threatened or endangered species. What is determinative is whether or not the habitat is "essential to the conservation of the species" and special management of that habitat is possibly necessary. 16 U.S.C. § 1532(5)(A)(i). Thus, the fact that a particular habitat does, in fact, require special management is demonstrative evidence that the habitat is "critical." Defendant, on the other hand, takes the position that if a habitat is actually under "adequate" management, then that habitat is per se *not* "critical." This makes no sense. A habitat would not be subject to special management and protection if it were not essential to the conservation of the species. The fact that a habitat is already under some sort of management for its conservation is absolute proof that such habitat is "critical."

Defendant's construction of "critical habitat" also adds the term "additional" to the statute. As Defendant stated in its final rule, "*Additional* special management is not required if adequate management or protection is already in place." 66 Fed. Reg. 8530, 8543 (emphasis added). As Defendant explained in its Combined Memorandum, "The FWS excluded National Forest lands in Arizona and New Mexico, and lands of the Mescalero Apache and Navajo Nation, from the Mexican spotted owl critical habitat designation because *additional special management* was not required ...." (emphasis added) (Defendant's Combined Memorandum, p. 25)

Any reading of § 1532(5)(A) fails to reveal the term "additional." It is a canon of statutory construction that words should not be added to or read into a statute. *U.S. v. Watkins*, 278 F.3d 961,

965 (9th Cir.2002); *See also Matter of Borba*, 736 F.2d 1317 (9th Cir.1984). There is absolutely nothing in § 1532, or its implementing regulations, to support Defendant's inclusion of "additional." As such, Defendant's construction of the "critical habitat" definition is impermissible and contrary to law.

Defendant specifically argues that the phrase "special management considerations or protection" is ambiguous. (Defendant's Combined Memorandum, p. 15.) However, Defendant's own regulations implementing the ESA provide a clear and unambiguous definition of the phrase. The phrase means "any methods or procedures useful in protecting physical and biological features of the environment for the conservation of listed species." 50 C.F.R. § 424.02(j).

By using the term "any," the definition is all-inclusive. *See Oxford English Dictionary Online,* at www.dictionary.oed.com/cgi/entry/00009997. So long as they are useful in protecting a listed species' habitat, any and every method or procedure qualifies as a special management consideration or protection. It is simply contrary to the plain language of this definition to say that the existence of one method or procedure excludes the use of any and all others. Rather, by being all-inclusive, the definition clearly and unambiguously contemplates the use of more than one method of protection for any particular habitat. So long as they are useful, the more protections the better. Indeed, Defendant and FWS have been repeatedly told by various courts that any interpretation to the contrary is unlawful. *See* Section III(B) *infra.*

Defendant's interpretation of the "special management considerations or protection" definition as somehow limiting the number of allowable protections to a listed species' habitat is not only unsupported by

the English language, but runs contrary to one of the enunciated policies of the ESA. It is the first policy of the ESA "that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter." 16 U.S.C. § 1531(c)(1). Thus, Congress intended that all Federal agencies and departments utilize their authorities to, among other things, conserve the habitats of listed species. This purpose would be thwarted, however, if such agencies and departments, particularly FWS, were barred from doing so merely because another department or agency had its own protections in place. The stated purpose is not for *some* agencies and departments to conserve endangered species; *all* must do so. Thus, *any* and every protective method or procedure should be employed to further that purpose. There is no ambiguity.

As the foregoing demonstrates, Defendant's interpretation of the definition of "critical habitat" fails to satisfy either step of the *Chevron* analysis. The definition is unambiguous and Defendant's tortured construction of it is impermissible and contrary to law. Therefore, having failed to satisfy either of the *Chevron* steps, Defendant's construction of "critical habitat" is entitled to no deference. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82.

**B. Defendant's Application of the ESA is Unlawful.**

As explained above, Defendant's position regarding the ESA is that designation of critical habitat is unnecessary when such designation would merely provide "additional" protections. Based on this position, Defendant excluded all FS lands and those of the Navajo Nation and Mescalero Apache in Arizona and New Mexico from its critical habitat designation. Defendant's position, however, is knowingly unlawful. Defendant and FWS have been repeatedly told by federal courts that the existence of other habitat protections does not relieve Defendant from designating critical habitat.

In *Natural Resources Defense Council ("NRDC") v. United States Department of the Interior,* 113 F.3d 1121 (9th Cir.1997), FWS, in defense of its decision not to designate critical habitat for the endangered gnatcatcher, argued that a "far superior" state-run protection program adequately protected the habitat. *Id.* at 1126. In dismissing this argument, the Ninth Circuit held, "Neither the [Endangered Species] Act nor the implementing regulations sanctions nondesignation of habitat when designation would be merely *less* beneficial to the species than another type of protection." *Id.* at 1127 (emphasis original). The Ninth Circuit explained, "the [state-run] alternative cannot be viewed as a functional substitute for critical habitat designation. Critical habitat designation triggers mandatory consultation requirements for federal agency actions involving critical habitat." *Id. See also Northern Spotted Owl v. Lujan,* 758 F.Supp. 621, 629 (W.D.Wash.1991) ("That the Thomas Committee was working to develop conservation strategies for the spotted owl did not relieve the [Fish and Wildlife] Service of its obligation under the ESA to designate critical habitat to the maximum extent determinable.").

In *Middle Rio Grande Conservancy District v. Babbitt,* 206 F.Supp.2d 1156 (D.N.M.2000), the District Court of New Mexico further explained the importance of designating critical habitat to the conservation of a threatened or endangered species. Designation of critical habitat is given the same priority under the ESA as the listing of a threatened or endangered species. *Id.* at 1169. It is of such a priority that the ESA "compels the designation despite other methods of protecting

the species the Secretary [through FWS] might consider more beneficial." *Id.* (citing *NRDC,* 113 F.3d at 1127).

Formal designation of critical habitat is a key protection to endangered and threatened species. *Id.* As 16 U.S.C. § 1531 explains, the ESA "clearly intends to do more than save endangered species and threatened species from jeopardy; it is intended to bring endangered and threatened species back from the brink of extinction to a point where statutory protections are no longer necessary." *Id.* (citations omitted). Therefore, the designation of critical habitat serves as "the principal means for conserving an endangered species, by protecting not simply the species, but also the ecosystem upon which the species depends." *Id.* (citations omitted).

In *Conservation Council for Hawai'i v. Babbitt,* 2 F.Supp.2d 1280 (D.Haw.1998), FWS declined to designate critical habitat for 245 endangered plant species. *Id.* at 1281. In support of its decision, FWS offered three arguments. Of particular relevance to this discussion, FWS argued that "little benefit would result from designation because the plant species is on federal land and designation of a critical habitat would not increase the precautions that the government must already take." [3] *Id.* at 1283.

The court flatly rejected FWS' argument. In the court's own words:

> This rationale fails to establish a rational basis for nondesignation of critical habitat for two reasons. First, the FWS fails to consider the specific effect of the consultation requirements on each species. Second, the FWS incorrectly assumes that designation of critical habitat

has no benefit outside of the consultation requirements.

*Id.* at 1286.

Under the ESA, once a species is listed as endangered or threatened, federal agencies are required to consult with FWS to determine whether a planned federal activity would "jeopardize the continued existence" of the species. *Id.*; 16 U.S.C. § 1536(2). Upon the designation of critical habitat, "the consultation requirement also includes consideration of whether the federal activity would 'result in the destruction or adverse modification' of the critical habitat." *Id.; Id.* Nonetheless, in *Conservation Council,* FWS argued that "the considerations of the jeopardize prong would be no different than the considerations under the critical habitat prong . . . ." *Id.* at 1286–87.

The court in *Conservation Council* noted, however, that FWS' position was contrary to its own interpretation of the ESA in its memorandum to the court. *Id.* at 1287. In its memorandum, FWS explained:

> In analyzing the benefits to the species, the [Fish and Wildlife] Service may consider the question of the overlap of the jeopardy and adverse modification standards, but must do so as applied to the species and habitat at issue. The Service must explain in reasonable detail the degree to which the standards overlap with respect to that species and the habitat it needs for its continued survival.

*Id.*

In declining to designate any FS lands or those of the Navajo Nation and Mes-

---

3. FWS' position in *Conservation Council* closely mirrors its position in this case. According to FWS' final rule, "the designation of critical habitat likely will not require any additional restrictions for section 7 [16 U.S.C. § 1536] consultations, including projects de-

signed to reduce the risk of wildfire." 66 Fed.Reg. 8530, 8533. FWS takes this position despite the fact that it was previously advised by the United States District Court of Hawai'i that such a position is not rational.

calero Apache in Arizona and New Mexico as critical habitat for the Mexican spotted owl, Defendant, by and through FWS, eliminated a crucial part of the consultation requirements of the ESA, namely the "adverse modification" prong. In doing so, Defendant acted in direct contravention of the express purpose of the ESA: to conserve "the ecosystems upon which endangered species and threatened species depend." 16 U.S.C. § 1531(b). Moreover, without designated critical habitat, FWS cannot "explain in reasonable detail" the degree to which the jeopardy and adverse modification prongs overlap, something FWS admitted it "must" do. *Conservation Council*, 2 F.Supp.2d. at 1287.

Beyond the consultation protections created by designating critical habitat, such designation also affords "significant substantive" protections. *Id.* at 1288.

> Substantively, designation establishes a uniform protection plan prior to consultation. In the absence of such designation, the determination of the importance of a species' environment will be made piecemeal, as individual federal projects arise and agencies consult with the FWS. This may create an inconsistent or short-sighted recovery plan. In addition, Congress has recognized that consultations expected under Section 7 [16 U.S.C. § 1536] may ultimately overwhelm the FWS. Thus, the designation ensures that the proper attention and focus is provided in determining a recovery plan. Furthermore, ... designation of critical habitat plays a critical role in identifying those areas in which a § 7 consultation will be triggered. Accordingly, establishing a uniform plan prior to consultation provides substantial, additional protection for a species beyond the consultation requirement.

*Id.* (internal quotations and citations omitted).

In declining to designate critical habitat on any FS lands or on those of the Navajo Nation and Mescalero Apache in Arizona or New Mexico, Defendant eliminated all of the aforementioned substantive protections of the Mexican spotted owl. For example, if and when a federal project arises on owl habitat on federal land in Arizona or New Mexico, the agency responsible for the project is under no obligation to consult with FWS regarding the possible adverse modification of the habitat. Additionally, determinations regarding the owl's critical habitat will be made piecemeal inasmuch as federal lands in Colorado and Utah include critical habitat while those in Arizona and New Mexico do not. In other words, the Mexican spotted owl will receive the full protection of the ESA in Colorado and Utah, but will only be partially protected in Arizona and New Mexico. This inconsistent application of the ESA's substantial protections of the Mexican spotted owl is particularly inappropriate in light of the fact that over 8 million acres of the 13.5 million acres of proposed critical habitat exist on federal lands in Arizona and New Mexico. 65 Fed.Reg. 45336, 45342.[4]

Based upon the foregoing, Defendant, as well as FWS, knew or should have known that their decision not to designate critical habitat in Arizona or New Mexico on the basis that it would only provide "additional" protection was unlawful. Indeed, Defendant and FWS have been told by no fewer than three federal courts, including the Ninth Circuit, that its position is untenable and in contravention of the ESA. Nevertheless, with apparent disregard of the courts, Defendant decided not to designate critical habitat on FS lands or those

---

**4.** This figure does not include the approximately 1.2 million acres of proposed critical habitat found on tribal lands in Arizona and New Mexico. 65 Fed.Reg. 45336, 45342.

of the Navajo Nation and Mescalero Apache in Arizona and New Mexico on the basis that "adequate" plans were already in place and "additional" protection was unnecessary. This argument has already failed three times. It fails yet again here.

This is not a new situation for Defendant or FWS. As noted by the Tenth Circuit in *New Mexico Cattle Growers v. United States Fish and Wildlife Service*, 248 F.3d 1277 (10th Cir.2001), FWS has long held the policy position that "CHDs [Critical Habitat Designations] are unhelpful, duplicative, and unnecessary." *Id.* at 1283. Between April 1996 and July 1999, FWS designated more than 250 species as threatened or endangered under the ESA, but had made critical habitat designations for only 2. *Id.* (citing S.Rep. No. 106–126, at 2 (1999)). Of a total of 1,200 species listed by FWS as threatened or endangered, FWS has designated critical habitat for only 113(9%) of them. S.Rep. No. 106–126, at 2. Furthermore, while FWS must designate critical habitat once a species is listed, "the FWS has typically put off doing so until forced to do so by court order." *New Mexico Cattle Growers*, 248 F.3d at 1283 (citing S.Rep. No. 106–126, at 2). In fact, as of July 1999, there were 17 active pending lawsuits against the FWS regarding critical habitat designations. As of that same date, 15 lawsuits had already been decided, 14 *against* FWS. S.Rep. No. 106–126, at 2.

Perhaps it is time for FWS to reassess its "long held policy position."

## C. The Existing Plans Are Not and Have Never Been Adequate.

Defendant's sole basis for declining to designate critical habitat on FS lands in Arizona and New Mexico was the existence of the Forest Service's ("FS") Forest Plans. According to Defendant and FWS, since the Forest Plans provided "adequate" protection to the Mexican spotted owl, no "additional" protection from critical habitat designation was necessary. Of course, if it turns out that the Forest Plans were, in fact, not "adequate" then according to Defendant's theory, critical habitat designation would be mandatory.

As detailed in Section II(B) of this Order, FS' Forest Plans are not adequate and are, in fact, legally insufficient. First of all, FS' delay and extreme reluctance in complying with not only the ESA but numerous court orders, as well, raises serious doubts about FS' commitment to protecting the Mexican spotted owl and its habitat. Indeed, FS made affirmative efforts to block the listing of the owl as a threatened species. Therefore, the adequacy of FS' protection of the owl is inherently suspect.

More importantly, however, is the fact that the grazing standards of FS' Forest Plans for Arizona and New Mexico have not been properly implemented. As FWS recognized in its Recovery Plan of December 1995, grazing can influence the Mexican spotted owl by "altering (1) prey availability, (2) susceptibility of spotted owl habitat to fire, (3) the health and condition of riparian communities; (sic) and (4) development of habitat." (Plaintiff's Attachments, p. 24.) Clearly, livestock and wildlife grazing is a threat to the continued existence of the Mexican spotted owl. (*Id.* at 31.) Indeed, in Arizona and New Mexico, the primary threats to the spotted owl are "catastrophic wildfire, recreation, and grazing." (*Id.* at 50.) It is undisputed that "overuse of riparian habitat for grazing has occurred, that the greatest impact of grazing on the Mexican spotted owl occurs in riparian areas, and that the effects vary from site to site." (1996 Biological Opinion; *Id.* at 64.) Accordingly, the goals of the Recovery Plan were "(1) to maintain or enhance prey availability, (2) to maintain potential for beneficial ground

fires while inhibiting potential for destructive stand-replacing fire, (3) to promote natural and healthy riparian plant communities, and (4) to preserve the processes that ultimately develop spotted owl habitat." (*Id.* at 45.)

Nevertheless, despite the knowledge that grazing negatively impacts the owl and its habitat, FS failed to immediately and properly implement the grazing standards of its Forest Plans that were supposed to protect the owl's habitat. As a result, FS was ordered by the Arizona District Court to re-initiate consultation with FWS. *Forest Guardians,* CV 00–612 TUC–RCC (Nov. 22, 2002). The court specifically found that the grazing standards had not been properly implemented since 1996, years before FWS published its final rule. *Id.* Inasmuch as the Forest Plans have not been properly implemented since 1996, there is no rational basis upon which FWS can claim that the Plans adequately protect the habitat of the Mexican spotted owl, particularly against the theat of grazing.

Moreover, Defendant, by and through FWS, knew or should have known nearly a month *before* publishing its Proposed Rule, and approximately eight months *before* publishing its Final Rule, that FS' Forest Plans did not adequately protect the spotted owl's habitat. On May 24, 2000, the Arizona District Court enjoined FS' implementation of the grazing standards of its Forest Plans for Arizona and New Mexico. *Arizona Cattle Growers,* CV 97–1868 PHX–RCB (May 24, 2000). The court based its decision, in part, upon FS' misrepresentations to the court. *Id.* Neither the Proposed Rule nor Final Rule makes any mention of this decision.

Defendant argues that any reliance upon the decision in *Arizona Cattle Growers* is mistaken as the injunction is consistent with the implementation provisions of the grazing standards. (Defendant's Combined Memorandum, p. 31.) Be that as it may, the court specifically found that the grazing provisions of the Forest Plans were being improperly implemented by FS. *Arizona Cattle Growers,* CV 97–1868 PHX–RCB (May 24, 2000). The court further found that FS was implementing the grazing provisions on a discretionary basis, before the performance of any project-level or site-specific analysis of grazing management needs, contrary to FS' representations to the court. *Id.* Furthermore, as a result of the injunction, formerly completed consultations with FWS were rendered incomplete. *Id.* (September 13, 2000). Consequently, FS was required to engage in further consultations with FWS with respect to the Forest Plans' grazing provisions since FWS believed, as did the court, that the provisions would be immediately implemented. *Forest Guardians v. United States Forest Service,* CV 00–612 TUC–RCC (October 17, 2000).

The court in *Forest Guardians* aptly explained why the injunction in *Arizona Cattle Growers* is far more pertinent than FWS would like to believe.

On May 24, 2000, Judge Broomfield entered an order in *Ariz. Cattle Growers Ass'n v. Towns, supra,* enjoining the Forest Service from enforcing the utilization standards on p. 94 of the Record of Decision for Amendment of Forest Plans, dated June 5, 1996, through any AOP [Annual Operating Plan] or alteration thereof. The result of this injunction is not only that Forest Service is now implementing the utilization standards at a slower pace than originally intended at the time the amendments were adopted, but that the Forest Service is prohibited from implementing the standards on an interim basis until site specific analysis is completed. Moreover, the Forest Service stated at oral argument that if NEPA analysis cannot be completed before a specific allotment

is due for renewal, the grazing permit is renewed under the terms of the old permit. *These facts indicate that not only is Forest Service unable to implement the standards on an interim basis, as anticipated by FWS at the time of consultation, but that in some cases the Forest Service has been unable to implement the standards even at the time of renewal of grazing permits, as it contends was anticipated during consultation, because it has not been able to complete NEPA analysis on all allotments where old grazing permits have expired.*

*Id.* (emphasis added).

In short, FS'' improperly implemented grazing standards failed to adequately protect the Mexican spotted owl, a fact of which FWS was aware eight months prior to its Final Rule. Therefore, FWS' determination that the Forest Plans provided "adequate" protection to the owl was fundamentally flawed.

**D. Defendant's Interpretation of "Relevant Impact" Is Entitled to Deference.**

█ Under the ESA Defendant, through FWS, may exclude an area from critical habitat designation if, after considering "the economic impact, and any other relevant impact," it determines that the benefits of excluding the area outweigh the benefits of designating that area as critical habitat. 16 U.S.C. § 1533(b)(2). The language of this provision specifically provides that Defendant, through FWS, can consider economic and any other relevant impacts when weighing the relative benefits of a critical habitat designation.

In its Final Rule, FWS excluded the lands of the San Carlos Apache pursuant to 16 U.S.C. § 1533(b)(2). Specifically, FWS explained that "[t]he designation of critical habitat would be expected to adversely impact our working relationship with the Tribe and we believe that Federal regulation through critical habitat designation would be viewed as an unwarranted and unwanted intrusion into tribal natural resource programs. Our working relationships with the Tribe has (sic) been extremely beneficial in implementing natural resource programs of mutual interest." 66 Fed.Reg. 8530, 8545. Thus, FWS excluded the lands of the San Carlos Apache on the basis that the benefit of maintaining a good working relationship with the Tribe (a relevant impact) outweighed the benefit to the Mexican spotted owl from designating those lands as critical habitat.

There is nothing facially ambiguous about § 1533(b)(2). Therefore, this Court must give effect to the unambiguously expressed intent of Congress. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778, 2781–82. The only possible ambiguity in § 1533(b)(2) is what constitutes a "relevant" impact. Assuming *arguendo* that "relevant" is ambiguous, this Court believes that FWS' determination that its working relationship with the San Carlos Apache is relevant is based upon a permissible construction of § 1533(b)(2). *Id.* It is certainly reasonable to consider a positive working relationship relevant, particularly when that relationship results in the implementation of beneficial natural resource programs, including species preservation. In short, since both of the *Chevron* elements are satisfied, this Court defers to FWS' determination that its working relationship with the San Carlos Apache is a relevant impact under 16 U.S.C. § 1533(b)(2).

**E. Defendant's Failure to Produce the San Carlos Apache Management Plan Violates the Endangered Species Act as well as the Administrative Procedure Act.**

█ Regardless of the foregoing, it appears to be uncontested that the manage-

ment plan of the San Carlos Apache has never been produced by Defendant or FWS for review. (Plaintiff's Memorandum, p. 30, fn. 8; Plaintiff's Combined Reply Memorandum, p. 27, fn. 17.) It is not part of the record in this case and there is nothing to indicate that it was ever available during comment and review period following Defendant's Proposed Rule.

Under 16 U.S.C. § 1533(b)(5), whenever Defendant proposes to list a species or designate critical habitat, it must publish the proposed rule in the Federal Register and give notice to the public, as well as any interested parties. The contents of a proposed rule "shall contain the complete text of the proposed rule, a summary of the data on which the proposal is based (including, as appropriate, citation of pertinent information sources), and shall show the relationship of such data to the rule proposed." 50 C.F.R. § 424.16(b). These requirements equally apply to final rules. 50 C.F.R. § 424.18(a). After publication of the proposed rule, public comment and public hearings are required. 50 C.F.R. § 424.16(c)(1)(vi).

As the record in this case demonstrates, the management plans of the Forest Service, the Navajo Nation, and the Mescalero Apache were all available for public commentary and scrutiny, particularly since Plaintiff relies upon all three plans in support of its Motion for Summary Judgment. The importance of making these plans available is demonstrated in the "Public Comments Solicited and Public Hearings" section of Defendant's Proposed Rule.

> We intend to make any final action resulting from this proposal to be as accurate and as effective as possible. Therefore, we are soliciting comments from the public, other concerned governmental agencies, the scientific community, industry, or any other interested party concerning this proposed rule. We particularly seek comments concerning:

> (1) The reasons why any habitat should or should not be determined to be critical habitat as provided by section 4 of the Act, including whether the benefits of excluding areas will outweigh the benefits of including areas as critical habitat.

> *Specifically we ask if there is adequate special management and protection in place on any lands to allow us not to designate these lands as critical habitat.* Further, we ask whether all areas identified in the Recovery Plan should be designated as critical habitat;

> \*    \*    \*    \*    \*    \*

> (3) *Land use practices and current or planned activities in the subject areas and their possible impacts on proposed critical habitat;*

65 Fed.Reg. 45336, 45345 (emphasis added).

The "Peer Review" Section of Defendant's Proposed Rule further emphasizes the importance of making relevant and applicable management plans available for inspection.

> In accordance with our policy published on July 1, 1994 (59 FR 34270), we will seek the expert opinions of at least three appropriate and independent specialists regarding this proposed rule. *The purpose of such review is to ensure listing decisions are based on scientifically sound data, assumptions, and analyses.*

*Id.* (emphasis added).

Nonetheless, despite Defendant's stated desire to make a fully-informed and scientifically-based decisions regarding critical habitat designations, it deprived the public, other governmental agencies, the scientific community, industry, as well as its own independent specialists of the management plans of the San Carlos Apache. In other words, Defendant solicited the input of others without providing them with all of

the information necessary to make any such input meaningful and informed.

Defendant cannot solicit public comments and seek peer review while withholding vital information. It defeats the very purpose of 16 U.S.C. § 1533(b)(5), as well as C.F.R. §§ 424.16 and 424.18, to not provide the public with information based upon which critical habitat may or may not be designated. Therefore, by denying the public any opportunity to review, inspect, or comment upon the management plans of the San Carlos Apache, Defendant violated the ESA, its own regulations, as well as its policy as set forth in 59 Fed.Reg. 34270. Accordingly, Defendant's decision regarding the San Carlos Apache cannot stand.

Furthermore, Defendant's failure to make available the San Carlos Apache Plan also violated the Administrative Procedure Act ("APA"). Under the APA, an agency is required to publish in the Federal Register a "[g]eneral notice of proposed rule making." 5 U.S.C. § 553(b). Publication is required in order to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). Then, "[a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." *Id.* These procedural requirements are in addition to those imposed by the ESA. Under the APA, however, a final agency action, finding, or conclusion shall be held unlawful and set aside if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or made "without observance of procedure required by law." 5 U.S.C. § 706(2)(A),(D).

The Ninth Circuit already addressed this issue in *Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995). In *Idaho Farm Bureau*, FWS' final rule listing the Bruneau Hot Springs Snail as an endangered species was set aside by the district court due, in part, to FWS' failure to comply with the notice and comment provisions of the APA and the ESA. On appeal, the Ninth Circuit had to decide whether FWS violated the notice and comment requirements of the APA by failing to make a provisional report by the United States Geological Survey ("USGS") available for public comment. *Id.* at 1402. FWS referred extensively to the report in its final listing rule. *Id.*

In determining that FWS violated the APA, the Ninth Circuit noted that "[a]n agency can add material to the administrative record after the close of a public comment period when the material is a response to the comments." *Id.* (citation omitted). An agency may also use "supplementary data, unavailable during the notice and comment period, that expands on and confirms information contained in the proposed rule making and addresses alleged deficiencies in the pre-existing data, so long as no prejudice is shown." *Id.* (internal quotations omitted; citations omitted). In *Idaho Farm Bureau*, however, the report that FWS failed to make available neither supplemented nor confirmed existing data, nor was it added in response to public comments. *Id.* Rather, the report was integral to FWS' decision as it provided "unique information that was not duplicated in other reports," and was "critical to FWS' decision to list the Springs Snail." *Id.* at 1403.

In light of the foregoing, the Ninth Circuit determined that "the necessity for notice and opportunity to comment on the USGS study was greatly heightened because FWS relied largely on the USGS study to support its final rule." *Id.* Also, "[o]pportunity for public comment is particularly crucial when the accuracy of important material in the record is in ques-

tion." *Id.* According to the Ninth Circuit, "[t]he validity of the USGS report on which FWS relied is questionable because the report was a 'provisional draft' that USGS did not want released to the public." *Id.* Therefore, the Ninth Circuit held,

> By failing to provide the public with an opportunity to review the USGS report in these circumstances, FWS made its listing decision "without observance of procedure required by law." 5 U.S.C. 706(2)(D).

*Id.* at 1404.

In this case, FWS relied almost exclusively upon the incomplete management plan of the San Carlos Apache in its decision not to designate any critical habitat for the Mexican spotted owl on those lands. 66 Fed.Reg. 8530, 8545. According to FWS, the yet-to-be-completed plan of the San Carlos Apache provided sufficient protection to the owl "that the designation of critical habitat will provide little or no additional benefit to the species." *Id.* FWS referred to these "developing" management plans in its Proposed Rule, as well. 65 Fed.Reg. 45336, 45344–45.

As in *Idaho Farm Bureau,* the need for public comment on the San Carlos Apache management plans was doubly heightened. First, FWS relied heavily upon the incomplete plans in excluding all San Carlos Apache lands from its critical habitat designation. Second, the accuracy of the San Carlos Management plans are in question as they are incomplete and may even be subject to a confidentiality agreement. (Plaintiff's Memorandum, p. 30, fn. 8.) Therefore, as in *Idaho Farm Bureau,* FWS made its final decision regarding critical habitat for the Mexican spotted owl on San Carlos Apache lands "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

**F. Defendant's Exclusion of Unoccupied Areas Is Impermissible and Unsupportable.**

In its Final Rule, Defendant, by and through FWS, also excluded all unoccupied habitat on FS lands in Arizona and New Mexico. Under the ESA, critical habitat includes those areas in which are found physical or biological features essential to a species' conservation, as well as lands that are unoccupied by the species but which Defendant determines are essential. 16 U.S.C. § 1532(5)(A). In its Proposed Rule, Defendant determined that lands unoccupied by the Mexican spotted owl were essential to the owl's conservation.

> The inclusion of both occupied and currently unoccupied areas in this critical habitat proposal is in accordance with section 3(5)(A)(I) of the Act [16 U.S.C. § 1532(5)(A) ], which provides that areas outside the geographical area currently occupied by the species may meet the definition of critical habitat upon a determination that they are essential for the conservation of the species. *We find that the inclusion of currently unoccupied areas identified in this rule as having one or more constituent elements is essential for conservation of the owl.*

65 Fed.Reg. 45336, 45341 (emphasis added).

Defendant made the same determination in its Final Rule.

> The inclusion of both currently occupied and potentially occupied areas in this critical habitat designation is in accordance with section 3(5)(A) of the Act [16 U.S.C. 1532(5)(A) ], which provides that areas outside the geographical area currently occupied by the species may meet the definition of critical habitat upon a determination that they are essential for the conservation of the species... The

species' Recovery Plan recommends that some areas be managed as "restricted habitat" in order to provide for future population expansion and to replace currently occupied areas that may be lost through time. *We believe that such restricted habitat is essential and necessary to ensure the conservation of the species.*

66 Fed.Reg..8530, 8536 (emphasis added).

Nevertheless, despite these determinations, Defendant excluded these essential and necessary lands from its critical habitat designation. (Defendant's Combined Memorandum, pp. 37–38.) Defendant attempts to provide a *post hoc* justification for this exclusion by declaring that the analysis for occupied and unoccupied habitat is "considerably different." (*Id.*, p. 37.) Be that as it may, Defendant, under whichever analysis, undeniably determined that lands unoccupied by the owl were essential and necessary to the owl's conservation. Therefore, Defendant's differing-analysis argument is irrelevant and its exclusion of unoccupied lands is arbitrary and capricious.

## IV. CONCLUSION

Defendant's Final Rule designating critical habitat for the Mexican spotted owl violates the Endangered Species Act, as well as the Administrative Procedure Act. Therefore, Defendant's Final Rule cannot stand.

**Accordingly,**

**IT IS ORDERED** as follows:

1. Plaintiff's Motion for Summary Judgment (document 43) is **GRANTED**.

2. Defendant's Cross–Motion for Summary Judgment (document 54) is **DENIED**.

3. Defendant **SHALL** re-propose critical habitat for the Mexican spotted owl within **three (3) months** of this Order. In its re-proposal, Defendant **SHALL** include all information and bases upon which the proposal is based.

4. During the public comment and review periods regarding its re-proposal, Defendant **SHALL** make available any and all management plans, including those of the San Carlos Apache, mentioned or referenced in the re-proposal.

5. Defendant **SHALL** publish its final designation of critical habitat for the Mexican spotted owl **within six (6) months** of this Order. Defendant's final designation **SHALL** be in full compliance with this Order.

6. Defendant's current critical habitat designation for the Mexican spotted owl **SHALL** remain in effect and be enforced until such time as Defendant publishes its final designation.

7. This case is **DISMISSED without prejudice**.

8. This Court **RETAINS JURISDICTION** over this matter to reopen the case and return it to the Court's active docket, in the event problems arise in relation to Defendant's compliance with this Order.