ARIZONA CATTLE GROWERS' ASSOCIATION, Plaintiff,

v.

Dirk KEMPTHORNE, et al., Defendants,

and

Center for Biological Diversity, Intervenor–Defendant.

No. 06–CV–1744–PHX–SRB.

United States District Court, D. Arizona.

Feb. 4, 2008.

Damien M. Schiff, M. Reed Hopper, R.S. Radford, Pacific Legal Foundation, Sacramento, CA, Norman D. James, Fennemore Craig PC, Phoenix, AZ, for Plaintiff.

Rebecca J. Riley, U.S. Dept. of Justice, Env't & Nat'l Resources Div., Washington, DC, for Defendants.

Matthew Gilbert Kenna, Western Environmental Law Ctr., Durango, CO, Erik Bowers Ryberg, Ctr. for Biological Diversity, Tucson, AZ, for Intervenor Defendant.

**OPINION AND ORDER**

SUSAN R. BOLTON, District Judge.

This matter arises out of the United States Department of the Interior and its Fish and Wildlife Service's (collectively the "Service") promulgation of the *Final Designation of Critical Habitat for the Mexican Spotted Owl,* 69 Fed.Reg. 53,182 (Aug. 31, 2004), under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq.* At issue are Plaintiff Arizona Cattle Growers' Association's Motion for Summary Judgment (Doc. 37), Defendants Dirk Kempthorne, et al.'s Cross Motion for Summary Judgment (Doc. 44), and Intervenor–Defendant Center for Biological Diversity's ("CBD") Motion for Summary Judgment (Doc. 45).

## I. BACKGROUND

### A. Procedural History

The events that precipitated this litigation began on December 22, 1989, when Dr. Robin D. Silver submitted a petition requesting that the Service consider listing the Mexican Spotted Owl (Strix occidentalis lucida) (the "Owl") as a threatened or endangered species under the ESA. *Final Rule to List the Mexican Spotted Owl as a Threatened Species,* 58 Fed.Reg. 14, 248, 14,252 (March 16, 1993); *Ctr. for Biological Diversity v. Norton,* 240 F.Supp.2d 1090, 1091 (D.Ariz.2003). Almost four years later, on March 16, 1993, the Service issued the final rule listing the Owl as a threatened species. 58 Fed.Reg. at 14,248. At the time of listing, the Service opined that "[d]esignation of critical habitat is prudent, but not determinable at this time." *Id.*

In addition to vesting the Service with listing responsibilities, Congress has directed it to determine those areas that constitute critical habitat for listed species. 16 U.S.C. § 1533(a)(3). The Service must, "to the maximum extent prudent and determinable," designate critical habitat concurrent with the listing of any species as threatened or endangered. *Id.* If critical habitat is not determinable at the time of listing, then the Service "may extend the one-year period . . . by not more than one additional year." *Id.* § 1533(b)(6)(C)(ii). By February of 1994 the Service had yet to propose a rule designating critical habitat for the Owl, so a group of concerned

citizens and environmental organizations filed suit to compel the Service to designate the Owl's critical habitat. *Silver v. Babbitt,* 94–CV–337–PHX–RGS; *Norton,* 240 F.Supp.2d at 1092. The court responded by ordering the Service to designate critical habitat in a final rule to be published no later than May 30, 1995. *Id.* On June 6, 1995, the Service designated 4.6 million acres of critical Owl habitat. *Final Rule Designating Critical Habitat for the Mexican Spotted Owl,* 60 Fed.Reg. 29, 914.

Shortly after publication, the Owl's critical habitat designation was challenged in *Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. U.S. Fish and Wildlife Service,* CV–95–1258–M (D.N.M.1997), for failure to complete the review required by the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* ("NEPA").[1] The court enjoined the Service from enforcing the critical habitat designation until completion of a NEPA review, leading the Service to revoke the critical habitat designation for the Owl on March 25, 1998. 63 Fed.Reg. 14,378; *Norton,* 240 F.Supp.2d at 1092. Following the revocation, when no new proposed rule designating the Owl's critical habitat had yet been published, a new lawsuit was filed asking the United States District Court for the District of New Mexico to order the Service into action. *Proposed Designation of Critical Habitat for the Mexican Spotted Owl,* 65 Fed.Reg. 45,336, 45,339 (citing *Sw. Center for Biological Diversity and Silver v. Babbitt and Clark,* CIV 99–519 LFG/LCS–ACE (D.N.M.2000)); *Norton,*

240 F.Supp.2d at 1092. While recognizing that it was in violation of the ESA, the Service requested still more time for publication of the proposed and final rules. *Norton,* 240 F.Supp.2d at 1092. These requests were denied and, on February 1, 2001, the service published a final rule designating 4.6 million acres of critical habitat. *Final Designation of Critical Habitat for the Mexican Spotted Owl,* 66 Fed.Reg. 8,530.

On August 27, 2001, the Center for Biological Diversity filed suit alleging that the Service's decision to designate roughly 4.6 of the proposed 13.5 million acres, and to exclude all National Forest Service lands, was in violation of the ESA and the Administrative Procedure Act ("APA"). *Norton,* 240 F.Supp.2d at 1109. The court agreed and, on January 13, 2003, ordered the Service to publish a revised proposed order within three months with a final order due following an additional three month period. *Id.* The Service then sought, and the court begrudgingly granted, an extension of these deadlines, although not to the extent that the Service requested. *Center for Biological Diversity v. Norton,* 2003 WL 22849594, *1 (D.Ariz. Feb.19, 2003). On August 31, 2004 the Service published the Final Rule designating critical habitat, which is now challenged by Plaintiff. 69 Fed.Reg. at 53,182.

## B. The ESA and Critical Habitat Designation

The ESA was enacted to, among other things, "provide a means whereby the eco-

---

1. The Tenth Circuit has held that NEPA compliance is required prior to critical habitat designation, however, this position has not been adopted in the Ninth Circuit. *See Catron County Bd. of Comm'rs, N.M. v. U.S. Fish and Wildlife Serv.,* 75 F.3d 1429, 1435–36 (10th Cir.1996); *but see Home Builders Ass'n of N. Cal. v. U.S. Fish and Wildlife Serv.,* 268 F.Supp.2d 1197, 1233 (E.D.Cal.2003) (*"Home*

*Builders I"*) (citing *Douglas County v. Babbitt,* 48 F.3d 1495, 1507 (9th Cir.1995)) (rejecting *Catron* and quoting *Douglas County* for its holding that "NEPA does not apply to the Secretary's decision to designate a habitat for an endangered or threatened species under the ESA"); *see also Revocation of Critical Habitat for the Mexican Spotted Owl,* 63 Fed. Reg. at 14, 378–79.

systems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). To further this policy, Congress directed the Secretaries of Commerce and the Interior to list threatened and endangered species and designate their critical habitats. *Id.* § 1532(15). ESA listing and critical habitat designation responsibilities for animals such as the Owl have been further delegated to the Service.

Critical habitat is defined as:

(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

(ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

*Id.* § 1532(5)(A). The Service must designate critical habitat "on the basis of the best scientific data available and after taking into consideration the economic impact" of the designation. *Id.* § 1533(b)(2).

## C. Plaintiff's Challenge to the August 31, 2004 Critical Habitat Designation

At present the Service has designated approximately 8.6 million acres of federal land as critical Owl habitat including canyon and forest land in Arizona, New Mexico, Colorado, and Utah. 69 Fed.Reg. at 53,182. Plaintiff challenges the legality of this critical habitat designation on the following grounds: (1) the Service failed to identify the "physical or biological features ... essential to the conservation of the species"; (2) the Service failed to deter-mine at what point the Owl will be conserved, and thus cannot identify the features essential to that end; (3) the Service unlawfully designated areas not occupied by the Owl as occupied critical habitat; (4) the Service failed to determine which areas contain the "physical or biological features ... essential to the conservation of the species" and thus designated areas as critical habitat that are missing one or more of the essential features; (5) the Service improperly included as critical habitat areas without first determining whether they "may require special management considerations or protection"; (6) the Service did not designate Owl critical habitat using the best scientific data available; and (7) the Service failed to properly take into account the economic impacts of specifying the area as critical habitat.

In its Motion for Summary Judgment, Plaintiff asks the Court to set aside the Final Rule and remand to the Service. Defendants and Intervenor respond that the Service complied with both the ESA and the APA in promulgating the critical habitat designation, and thus no grounds exist for invalidating the Final Rule. In addition, they argue that even if the Court were to find that the Service was not in complete compliance with the statutory requirements, the Final Rule should remain in effect pending any remand.

The Court, having considered the Cross–Motions for Summary Judgment, Intervenor's Brief, and the oral argument made to the Court, now turns to address each of Plaintiff's arguments.

## II. LEGAL STANDARDS AND ANALYSIS

Summary judgment is appropriately granted when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When the dis-

trict court reviews an administrative agency decision under the Administrative Procedure Act ("APA"), "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 770 (9th Cir.1985); *City & County of San Francisco v. United States,* 130 F.3d 873, 877 (9th Cir.1997). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g,* 753 F.2d at 769.

■■■ The APA, 5 U.S.C. § 706, governs judicial review of agency decisions under the ESA. *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 901 (9th Cir.2002). Section 706 states that a court "shall hold unlawful and set aside agency actions ... found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); *see also Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.,* 307 F.3d 964, 975 (9th Cir.2002). "This deferential standard ensures that the agency decision contains no clear error of judgment." *Nat'l Ass'n of Home Builders v. Norton,* 340 F.3d 835, 841 (9th Cir.2003) (citation omitted). The court presumes regulations to be valid, but the inquiry into their validity is a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■■■ Under the arbitrary and capricious standard, the court must decide whether the Service "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). The court must reverse an agency action when the agency has " 'relied on factors

which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.,* 265 F.3d 1028, 1034 (9th Cir.2001) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Critical habitat designated under the ESA may also be invalid if it is determined that the Service either failed to use the "best scientific data available" or that it failed to "consider[ ] the economic impact, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). The court's decision must be based on the administrative record, and "the basis for the agency's decision must come from the record." *Nat'l Ass'n of Home Builders,* 340 F.3d at 841 (citing *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife,* 273 F.3d 1229, 1236 (9th Cir.2001)). The court "cannot substitute [its] judgment for that of the agency." *Id.*

## A. Identification of Essential Physical or Biological Features

In defining critical habitat, 16 U.S.C § 1532(5)(A) differentiates between habitat that is "occupied" and habitat that is not "occupied." For "area[s] occupied by the species," critical habitat is limited to areas containing "physical or biological features (I) essential to the conservation of the species and (II) which may require special management consideration or protection." 16 U.S.C § 1532(5)(A). Thus, to satisfy part one of the statutory definition of occupied critical habitat, the Service must identify the "physical or biological features essential to the conservation of the [Owl]."

*Id.* Plaintiff contends that these features, also known as primary constituent elements ("PCEs"), are inadequately described in the critical habitat designation, and, therefore, violate the ESA.

The Owl's critical habitat designation identifies three categories of PCEs: (1) forest structure; (2) maintenance of adequate prey species; and (3) canyon habitat. 69 Fed.Reg. at 53,211. The PCEs for the Owl are as follows:

A. [PCEs] related to forest structure: (1) a range of tree species, including mixed conifer, pine-oak, and riparian forest types, composed of different tree sizes reflecting different ages of trees, 30 percent to 45 percent of which are large trees with a trunk diameter of 12 inches (0.03 inches) or more when measured at 4.5 feet (1.4 meters) from the ground;

(2) a shade canopy created by the tree branches covering 40 percent or more of the ground; and

(3) large dead trees (snags) with a trunk diameter of at least 12 inches (0.3 meters) when measured at 4.5 feet (1.4 meters) from the ground.

B. [PCEs] related to maintenance of adequate prey species:

(1) High volumes of fallen trees and other woody debris;

(2) A wide range of tree and plant species, including hardwoods; and

(3) Adequate levels of residual plant cover to maintain fruits, seeds, and allow plant regeneration.

C. [PCEs] related to canyon habitat include one or more of the following:

(1) presence of water (often providing cooler and often higher humidity than the surrounding areas);

(2) clumps or stringers of mixed-conifer, pine-oak, pinyon-juniper, and/or riparian vegetation;

(3) canyon wall containing crevices, ledges, or caves; and

(4) high percent of ground litter and woody debris.

*Id.* Plaintiff argues that the "ESA by its very terms requires some minimal degree of specificity [in defining PCEs] which, in this case, has not been met." (Pl.'s Combined Opp'n and Reply to Defs.' and Def.-Intervenor's Cross–Mots. for Summ. J. ("Pl.'s Reply") at 4.) Chief among Plaintiff's concerns is the "vagueness [that] abounds with the descriptions of the PCEs" which it claims fails to "put the public on adequate notice as to the PCEs." (Pl.'s Mem. of P. & A. in Supp. of Mot. for Summ. J. ("Pl.'s Mot") at 9–10.) To support this claim, Plaintiff highlights that "the Service does not provide a definitive list of qualifying trees"; that it uses vague terms including "high volumes," "wide range," and "adequate"; and that it uses generalized statements such as, "high percent of ground litter and woody debris." (Pl.'s Mot. at 9.) In response to Plaintiff's arguments, the Service contends that it used the best available science to arrive at the PCEs, and that this is all that the ESA requires.

If the Service were to set forth PCEs so utterly lacking in detail as to be facially deficient, then any critical habitat designation made in reliance on those PCEs would certainly fail to meet § 1532(5)(A)'s requirements for the simple reason that one cannot ascertain the physical or biological features essential to a species's conservation without first identifying those features with some minimal specificity. Indeed, where the Service has designated critical habitat without providing a sufficiently detailed description of the PCEs, at least one court has concluded that such a designation is arbitrary and capricious. *See Home Builders I,* 268 F.Supp.2d at 1211–13. In *Home Builders I* the court determined that the Service had essentially neglected to provide any meaningful description of the PCEs in the final rule des-

ignating critical habitat for the Alameda whipsnake. *Id.* at 1211. The Service's attempt to detail the PCEs for the whipsnake included unhelpful "sentences indicating that the [PCEs] 'are in' or 'may be found in' particular areas, or that particular habitat features 'may also contain' the elements," and generalizations such as: "a suitable range of temperatures," "sufficient" "corridors of plant cover," and "adequate insect populations." *Id.* at 1211–13. Fatal to the whipsnake habitat designation was that, "[n]one of these sentences tell the reader what the primary constituent elements actually are." *Id.* Plaintiff's attempt to draw parallels between the whipsnake PCEs and those specified for the Owl falls short of convincing the Court that the present Final Rule approaches the Service's failures identified in *Home Builders I*. While the Service may not have provided PCEs to a level of specificity sufficient to appease Plaintiff, it did satisfy its statutory obligation with the level of detail given in the Final Rule—and that is all the ESA requires.

To counter Plaintiff's reliance on *Home Builders I*, Defendants cite to a similar case, also from the Eastern District of California, *Home Builders Association of Northern California v. United States Fish and Wildlife Service*, 2006 WL 3190518 (E.D.Cal. Nov.2, 2006) *("Home Builders II"), modified on other grounds by* 2007 WL 201248 (E.D.Cal. Jan.24, 2007), in support of their position that the PCEs were set forth with the requisite level of specificity. The *Home Builders II* court addressed a challenge to the critical habitat designation for fifteen vernal pool species, ultimately concluding that the designation complied with the strictures of the ESA. 2006 WL 3190518, at *1. Similar to the arguments advanced by Plaintiff, the vernal pool species' PCEs were challenged for, among other things, lack of specificity. *Id.* at *16. Notably, the plaintiff argued that "there is no indication of the size of

the uplands or the mounds *or swales* they contain, and no explanation of what kind of food in the form of detritus would be acceptable." *Id.* The court rejected these arguments, writing that "Home Builders do not reference scientific data with regard to the species or PCEs in this case that the FWS should have considered and disregarded." *Id.* The *Home Builders II* court, in rejecting the plaintiff's argument, jumped directly into an analysis that examined whether the PCEs were supported by the best scientific data available, without first assessing whether the PCEs met some sort of baseline level of reasonable specificity. *Id.* Plaintiff, in its Reply, challenges Defendants' reliance on *Home Builders II* by finding error in the court's decision to proceed without making this preliminary determination. Plaintiff contends that the "court did not apprehend that the challenge to the vernal pool species' PCEs—like the challenge to the [O]wl's PCEs—is independent of the record because the ESA by its very terms requires some minimal degree of specificity which, in this case, has not been met." (Pl.'s Reply (citing *Home Builders I*, 268 F.Supp.2d at 1213).) Clearly there is some minimal level of specificity required—the Service may not write an absurdly brief set of PCEs for a species and then rely on an argument that the PCEs are supported by the best available science. However, that level of specificity was reached in this case, just as it was in *Home Builders II*. Thus, the *Home Builders II* court's decision to limit its analysis to a review of the Service's compliance with the best available science standard was appropriate, a finding that is consistent with the holding of *Home Builders*, which involved a set of PCEs patently less detailed.

Further undermining Plaintiff's argument is the clear indication from the *Home Builders I* court that it was more con-

cerned with the Service's failure to explicitly describe the physical or biological features as being *essential* to the whipsnake's conservation than it was with the PCEs' lack of specificity. *Home Builders I*, 268 F.Supp.2d at 1211, 1213. The *Home Builders I* court emphasized this distinction, writing "[m]ore significant, however, is the fact that Defendants do not provide a citation to any part of the Final Rule in which the Service identifies these four environments as essential for the conservation of the species." *Id.* at 1211. Later in its analysis, the court again uses this rationale to discredit what it characterized as "[t]he most definitive statement" provided in the list of whipsnake PCEs. *Id.* at 1213. Disregarding whether the description of these "definitive" features may have been sufficiently detailed, the court instead highlighted that the features were introduced by a phrase stating that they are "specific habitat features *needed by* whipsnakes." *Id.* at 1213. The court contrasted this with the Service's repeated use of the term "essential" in other parts of the PCEs section of the rule and opined "that it is unclear whether the term 'need' used in this context is meant to be synonymous with the term 'essential.'" *Id.* The whipsnake PCEs were invalidated primarily because of the Service's inability to unequivocally state that they were in fact "essential to the conservation of the species" as required by the ESA. 16 U.S.C. § 1532(5)(A)(i). Thus, Plaintiff's reliance on *Home Builders I* as evidence that PCEs have in the past been held to some threshold standard is substantially undercut.

In responding to Plaintiff, Defendants and Intervenor, in large part, rely on two simple arguments: the ESA does not require the level of specificity demanded by Plaintiff, and the Service used the best available science to set forth the PCEs. The Court agrees with these statements. Both § 1532(5)(A) and 50 C.F.R. § 424.12

undoubtedly require that the Service use some level of specificity in enumerating PCEs—to hold otherwise would eviscerate the definition of critical habitat, as PCEs constitute an essential component of occupied critical habitat and their existence is dispositive to any determination. No statute or regulation provides a formula for the Service to use in setting forth PCEs. Instead, the relevant federal regulation states that "[p]rimary constituent elements *may* include, but are not limited to, the following: roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dryland, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types." 50 C.F.R. § 424.12(b)(5) (emphasis added). The PCEs detailed by the Service address many of the categories contemplated by the regulation. For instance, "canyon habitat is used by owls for nesting, roosting, and foraging"; Owl "[b]reeding sites are located below canyon rims"; feeding sites include "canyon bottoms, on cliff faces and benches, and along canyon rims and adjacent lands"; geological features include "canyon wall containing crevices, ledges, or caves"; and vegetation is varied but specifies "mixed-conifer, pine-oak, pinyon-juniper," "hardwoods," and "residual plant cover to maintain fruits [and] seeds." 69 Fed.Reg. at 53,211.

Here the record does not support Plaintiff's argument that the PCEs are so vague as to make it unnecessarily difficult for the public to ascertain whether certain plots of land contain the Owl's PCEs. While certain terms used in the critical habitat designation, including those emphasized by Plaintiff, may, when viewed in isolation, be lacking in the requisite specificity, they are accompanied by other more detailed terms that, when taken together, are reasonably specific and identify the physical or biological features essential for the Owl's conservation. For example, the Service used the following description as

one attribute related to forest structure: "large dead trees (snags) with a trunk diameter of at least 12 inches (0.3 meters) when measured at 4.5 feet (1.4 meters) from the ground." *Id.* This statement, and others like it, are evidence that the Service has endeavored to provide PCEs within a reasonable level of specificity. Given the deference that this Court must accord the Service's decisions, the Court concludes that the PCEs are facially sufficient.

 With the conclusion that the PCEs contain the minimum level of specificity requisite to surmount this preliminary hurdle, the Court now inquires whether the PCEs are supported by the best available science—the position repeatedly taken by Defendants and Intervenor. Defendants argue that "the critical habitat designation is sufficiently detailed" and that "[t]he level of detail the Plaintiff would like is inconsistent with the biological reality of the habitat requirements for the owl and the best available science." (Defs.' Summ. J. Reply ("Defs.' Reply") at

2.) Tellingly, Plaintiff does not argue that the Service's PCEs are based on incorrect data or suspect science. In fact, Plaintiff had the opportunity to submit comments challenging the Service's choice of PCEs, and the science upon which they are based, and even to suggest alternative scientific evidence for consideration. Neither Plaintiff nor any other interested party submitted such a comment. 69 Fed.Reg. at 53,-185 (noting that "[d]uring the comment periods, we requested, but did not receive, any information regarding refinements to the [PCEs]."). Furthermore, Plaintiff conceded in the briefing that it "does not contend that the Service failed to use the best available scientific data in identifying the owl's PCEs." (Pl.'s Reply at 3.) The Court will not investigate whether the PCEs were based upon sound scientific record evidence as Plaintiff has failed to illuminate any contradictory evidence or even call into question any of the evidence cited by the Service as supporting the PCEs.[2] Thus, the Court concludes that the

2. Plaintiff argues that the Service has impermissibly shifted the establishment of quantitative reference points for the Owl PCEs to the Section 7 consultation process which, Plaintiff claims, "is not permissible, because the agency has the obligation to put the public on adequate notice as to the PCEs that support critical habitat designation." (Pl.'s Mot. at 10.) The Court disagrees. The Service's first priority is to administer those portions of the ESA that are within its purview in a manner consistent with Congressional intent—an obligation that outweighs Plaintiff's concerns. That intent was concisely stated by the Supreme Court in *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 174, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), where it wrote, "Congress intended endangered species to be afforded the highest of priorities." This position is further supported by the legislative history of the 1979 amendments to the ESA indicating that during Section 7 consultations, species should be "give[n] the benefit of the doubt." H.R.Rep. No. 96–697, at 12 (1979) (Conf.Rep.), *as reprinted in* 1979 U.S.C.C.A.N. 2572, 2576. While not specifi-

cally targeted at the PCE listing process, these comments evidence a preference when administering the ESA towards making decisions that will assist in conserving the species, even when there arguably could have been a more precise determination given additional resources.

Clearly it would be preferable to provide the greatest level of specificity in all PCEs, thereby reducing reliance on Section 7 consultations. However, the Service's ability to provide such detail is tempered by the statutory command that critical habitat be designated at the time of listing, or, when necessary, no later than one year following the listing date. *See* 16 U.S.C. § 1533(b)(6)(C). When balancing the demands of timely critical habitat designation versus scientific precision, the Court is mindful of the fact that the ESA's rigid critical habitat designation timeline is an important part of achieving the stated purpose of "provid[ing] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." *Id.* § 1531(b).

PCEs meet the statutory criteria of the ESA.

### B. Identification of the Point at Which the Owl will be Deemed Conserved

Conservation, as defined in the ESA, occurs when a listed species is brought "to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3). The ESA defines occupied critical habitat, in part, as the areas containing "those physical or biological features essential to the conservation of the species." 16 U.S.C. § 1532(5)(A)(i). Plaintiff latches on to the phrase "essential to the conservation" and, from this, argues that it is impossible to know what features are essential to Owl conservation without first identifying at what point that ultimate goal will be attained. In support of this argument, Plaintiff relies on the reasoning of the *Home Builders I* court which held that, "if the Service has not determined at what point the protections of the ESA will no longer be necessary for the snake, it cannot possibly identify the physical or biological features that are an indispensable part

of bringing the snake to that point." 268 F.Supp.2d at 1214.

■■■ While tempting in its logical simplicity, the Court is unconvinced that one cannot move forward with a conservation effort without first identifying that precise point at which conservation will be achieved. Furthermore, as highlighted by the *Home Builders II* court, the logic used in *Home Builders I* cited no caselaw and was based not on an examination of the overall statutory scheme, but instead on logical supposition. This Court takes an approach, and reaches a conclusion, identical to that reached in *Home Builders II*: that the language of the ESA requires a point of conservation to be determined in the recovery plan,[3] not at the time of critical habitat designation.

■■■ A fundamental rule of statutory construction is "that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute." *Hamdan v. Rumsfeld,* 548 U.S. 557, –––– ––––, 126 S.Ct. 2749, 2766–67, 165 L.Ed.2d 723 (2006) (citing *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (" '[W]here Con-

---

Using the best available science, the Service was unable to provide the quantitative reference points desired by Plaintiff, and instead advised in the Final Rule that some "quantitative estimates (e.g., basal area, canopy closure, etc.)" would be best established "through consultation." 69 Fed.Reg. at 53,211. There is no statutory command that the Service provide exhaustive notice to the public concerning all PCEs. Conversely, the ESA explicitly requires the expeditious designation of critical habitat using the best available science. 16 U.S.C. §§ 1533(b)(6)(C), 1533(b)(2). In weighing the need to inform the public versus the Service's critical habitat designation duties, the Court concludes that delaying the specification of some quantitative aspects of the PCEs until consultation is permissible—especially where, as here, there is no private land included in the critical habitat

designation and, thus, all land use decisions (e.g., grazing permits) will likely already involve the participation of agency biologists. (*See* Mem. in Supp. of Defs.' Cross–Mot. for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J. ("Defs.'Mot") at 12.)

**3.** Development and implementation of a recovery plan for each listed species is mandated by the ESA in all instances except where "such a plan will not promote the conservation of the species." 16 U.S.C. § 1533(f)(1). Unlike critical habitat designations, no time frame has been established for the promulgation of recovery plans. *Id.* In determining how to allocate resources towards recovery planning, the ESA requires that the Service "give priority to those endangered species or threatened species ... that are most likely to benefit from such plans." *Id.* § 1533(f)(1)(A).

gress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' ")). The ESA is a comprehensive piece of environmental legislation and, as such, it is necessary to examine all of its requirements in order to construe its specific commands. Viewed in isolation, the process of critical habitat designation seems a logical place to insert a requirement that the Service determine the point where the species will be conserved. However, instead, Congress explicitly instructed the Service to make this determination in the species's recovery plan. 16 U.S.C. § 1533(f).

Recovery plans must incorporate three separate categories of information, the second of which includes "objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list." *Id.* § 1533(f)(B)(ii). In contrast, the statutory language relating to critical habitat designation imposes no similar obligation. The Court presumes, therefore, that Congress, by requiring the inclusion of "objective, measurable criteria" specifying the point of conservation in one ESA section, while excluding it from another, acted intentionally. Plaintiff has offered no persuasive legal argument sufficient to call this presumption into question and accordingly its position is in opposition to Congressional intent.

Further distinguishing these two sections is the strict timeline imposed by Congress which mandates timely designation of critical habitat. There is no similar requirement for recovery plans. Had Congress deemed the point at which the species will be conserved as essential to the listing of the PCEs, then logically it would have included that requirement at the critical habitat designation stage. Rather, the ESA reflects a preference for swift designation of critical habitat with promulgation of the recovery plan—and its detailed explanation of when a species can be deemed conserved—to be more appropriately rendered at some future date.

 To address Plaintiff's more basic point, the Court is not persuaded that PCEs cannot be determined without first identifying the point where the Owl will no longer need ESA protection. Many elements incorporated in the Owl's PCEs, such as those specifying nesting sites and adequate prey species, would clearly be required for Owl conservation regardless of whether the Owl is deemed conserved after its population reaches one thousand or one million Owl individuals. All species need essential items including food, water, and shelter, and it is apparent that the Service can determine the areas containing these critical habitat elements without first knowing the point when the Owl will no longer be in need of ESA protection. The Court concludes that the Service fully complied with the ESA by setting forth PCEs, and designating critical habitat, without first determining at what point the owl will be deemed conserved.[4, 5]

---

4. In its Reply, Plaintiff devotes substantial space to an argument premised on the Ninth Circuit's holding in *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service,* 378 F.3d 1059 (9th Cir.2004). In *Gifford Pinchot,* the court held that a regulation interpreting the adverse modification standard used in Section 7 consultations was invalid because it contravened Congressional intent by "read[ing] the 'recovery' goal out of the adverse modification inquiry." *Id.* at 1069.

Plaintiff alleges that the Service's actions in this case similarly eliminate the recovery requirement, except this time in the context of critical habitat designations. While this argument is legally plausible, it is not supported by any record evidence that the Service actually failed to consider the Owl's recovery while drafting the PCEs. The Court has already determined that the Service is not required to specify the point of conservation in

## C. Designation of Occupied Versus Unoccupied Critical Habitat[6]

the critical habitat designation. Without any factual argument to contravene the Service's assertion that it "appropriately designated habitat for survival *and recovery*," the Court has no reason to disbelieve the Service's assertion. (Defs.' Reply at 3 (emphasis added).)

Plaintiff's reliance on *Gifford Pinchot* is vulnerable to an additional attack because if Plaintiff's argument were found factually supported, the result would be to *expand* the Owl's habitat, not decrease it. Plaintiff contends that the Service has erred by failing to acknowledge "that critical habitat also has a recovery or conservation component." (Pl.'s Reply at 5.) Accordingly, this alleged failure caused the service to designate Owl habitat "without regard for the species's conservation." (Pl.'s Reply at 5.) However, *Gifford Pinchot* held that "it is logical and inevitable that a species requires *more* critical habitat for recovery than is necessary for the species survival." 378 F.3d at 1069 (emphasis added). Thus, implicit in Plaintiffs argument that only survival—and not recovery or conservation—was considered, is the assertion that the Service should have designated more, not less, habitat. Plaintiff's standing in this suit is based upon the fact that it will be "substantially and negatively impacted by the designation of critical habitat for the owl." (Decl. Of Charles B. Lane in Supp. Of Pl.'s Mot. for Summ. J. at 2.) The Court cannot comprehend how Plaintiff could be injured by the Service's supposed under-designation of habitat acreage. *See Hein v. Freedom Religion Found., Inc.,* —— U.S. ——, ——, 127 S.Ct. 2553, 2574, 168 L.Ed.2d 424 (2007) (reiterating that the "irreducible constitutional minimum of standing" requires that the plaintiff demonstrate "(1) a 'concrete and particularized' 'injury in fact' that is (2) fairly traceable to the defendant's alleged unlawful conduct and (3) likely to be redressed by a favorable decision").

5. Incorporated in Plaintiff's argument that the Service has failed to determine the Owl's point of conservation is an explicit attack on the Owl Recovery Plan, which was published in 1995. *See* 69 Fed.Reg. at 53,183. Plaintiff states that, "the [recovery] plan does not provide the definitive criteria necessary to determine when the owl will be conserved." (Pl.'s Mot. at 11.) As the legal sufficiency of the Recovery Plan is not at issue in the case, Plaintiff's argument must be viewed as an

■ The Service may designate critical habitat that is either "occupied" or "out-

attempt to graft the recovery planning requirements into the critical habitat designation phase. Any claimed deficiencies in the Recovery Plan have little relevance to the critical habitat designation for the simple reason that the Service is under no obligation to create a recovery plan prior to designating critical habitat. Thus, any reference to the Recovery Plan cannot serve as a basis to invalidate the Owl's critical habitat designation.

6. Plaintiff, in both its Motion and Reply, argues at length that the Service has improperly shifted the designation of critical habitat to the Section 7 consultation process by including areas within the Owl critical habitat that contain no Owl PCEs. (Pl.'s Mot. at 13–14; Pl.'s Reply at 6–7.) According to Plaintiff, the Service erred by including certain areas using metes and bounds while simultaneously excluding these areas by written definition. 50 C.F.R. § 424.12(c) provides that "[e]ach critical habitat will be defined by specific limits using reference points and lines as found on standard topographic maps of the area." The Owl critical habitat designation "mapped critical habitat boundaries so as to exclude State and private lands. Where this was not possible, State and private areas are not included by definition in th[e] designation." 69 Fed. Reg. at 53,211.

Plaintiff contends that 50 C.F.R. § 424.12(c) contains "[n]o allowance . . . for exclusions 'by definition.' " (Pl.'s Reply at 6.) This position, however, is not supported by case law and merely seeks to impose an obligation on the Service beyond that contemplated by the regulation. The Service complied with the regulation by providing a metes and bounds description of the habitat, and its decision to exclude some areas within those metes and bounds by definition was well within its proper exercise of discretion. The four affected States and any private landowners will not be forced to resort to Section 7 consultation, as the plain language of the Final Rule clearly excludes their property from the designation. Additionally, Plaintiff's suggestion that the Service failed to use the best scientific methods by opting not to conduct a "walking tour" of the 8.6 million acre site is preposterous. (Pl.'s Reply at 7.) The Court rejects this contention outright and finds that

side the geographical area occupied" by the species. 16 U.S.C. § 1532(5)(A). Differentiation between occupied and unoccupied habitat is necessary so that the Service may apply the proper ESA analysis. Statutory conditions that must be met before designating unoccupied areas are more onerous that those needed for occupied habitat. *Id.* The Final Rule designated occupied habitat only; the Service has not designated unoccupied habitat for the Owl. Plaintiff believes that the Final Rule impermissibly "blurs the distinction between occupied and unoccupied critical habitat by designating as occupied habitat ... areas where owls are likely to occur." (Pl.'s Reply at 7.) As a result, Plaintiff contends that the Service applied the less stringent requirement to areas that the Service acknowledged are locations where the Owl is merely "likely to occur." Plaintiff argues that the Service's decision to include those areas was based on an unreasonable interpretation of the statutory language, and that, for this reason, the designation is invalid. The Service responds that it reasonably interpreted the term occupied to include those areas where the Owl is likely to occur, and further contends that this interpretation is owed deference by the Court.

"When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). While Congress did provide a list of definitions in the ESA, it chose not to define "occupied." *See* 16 U.S.C. § 1532; *Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior,* 344 F.Supp.2d 108,

120 (D.D.C.2004) (finding that "[t]he ESA does not define 'occupied'" and that "the Service has retained flexibility" when defining the term). It is reasonable to infer, therefore, that Congress did not speak on this precise question. Where, as is the case here, the statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. In a situation where Congress has implicitly delegated authority to the agency, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844, 104 S.Ct. 2778. When reviewing the interpretation for reasonableness, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Id.*

Generally, formal agency actions, such as those resulting from notice-and-comment rulemaking, warrant *Chevron* deference. *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). However, agency actions that lack the force of law, such as opinion letters, policy statements, and agency manuals, are not entitled to *Chevron* deference. *Id.,* In this case, Plaintiff argues that the Service's interpretation of the term "occupied" is not entitled to *Chevron* deference, and instead should be reviewed under the less deferential framework set forth in *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). In support of this position, Plaintiff relies exclusively on *United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), a case involving a tariff classifica-

---

the Service was well within its authority when it used the best available science to exclude certain areas within the metes and bounds by definition, instead of using metes and bounds to trace around every piece of State and private property.

tion ruling by the United States Customs Service. In *Mead,* the Supreme Court addressed a Customs ruling that was not subject to notice-and-comment procedures, did not bind third parties, was only conclusive between the recipient and the agency, and was one of 10,000 to 15,000 of these letters issued each year out of 46 different customs offices. *Id.* at 233, 121 S.Ct. 2164. The Final Rule in this case could not be more different. Here the critical habitat designation was subject to notice-and-comment, was part of a complex deliberative process involving substantial agency resources, and is universally legally binding. Critical habitat designations bear none of the indicia attributed to the Customs rulings in *Mead* and, thus, the Final Rule and its inclusion of areas where the Owl is "likely to occur" within the area of "occupied" habitat will be accorded *Chevron* deference.

 Plaintiff contends that because the term "occupied" is not defined in the ESA, the "Court should ascribe to it the ordinary dictionary meaning." (Pl.'s Mot. at 14.) This suggestion, however, is at odds with *Chevron's* command that the Court give deference to the Service's interpretation. Thus, the Court rejects Plaintiff's request to apply the common dictionary definition and instead will ascribe to the term "occupied" any meaning given by the Service, so long as that interpretation is reasonable. Here the Service interpreted "occupied" to include those "areas where owls are known to occur or are likely to occur." 69 Fed.Reg. at 53,185. Inclusion of those areas where Owls are "likely to occur" is, upon close examination, a reasonable interpretation of 16 U.S.C. § 1532(5)(A), and one that the court will not disturb.

The ESA requires that land be identified as either occupied or unoccupied; there is no third category. In reality, the best available science does not always per-

mit the Service to state with certainty whether a particular area is occupied. With the Owl, the Service contends that given the "limits of tracking species, the highly mobile nature of the owl, and the availability of scientific information about the habitats of the owls," a finding of "likely to occur" was the highest level of certainty that the Service could achieve in certain areas. (Defs.' Mot. at 19.) The Service's decision to treat those areas where the Owl is "likely to occur" as occupied is reasonable because the best available science led it to conclude that these areas are more likely than not areas where the Owl will occur. This flexible approach allows the Service to designate areas as occupied critical habitat when a preponderance of the evidence suggests that Owls reside there.

The position taken by the Service is not, as Plaintiff suggests, in conflict with the court's decision in *Home Builders I.* There the court held that while "uncertainty as to exactly where the [species] may be found does not mean that a designated area is not critical habitat, at some point such uncertainty makes it an abuse of discretion for the Service to designate the land as occupied under section 1532(5)(A)(i)." *Home Builders I,* 268 F.Supp.2d at 1221. That point of uncertainty was reached in *Home Builders I* because the plaintiff had cited to portions of the record suggesting that "specific information was available to the Service that some of this land was not, in fact, occupied by the snake." *Id.* Thus, evidence existed that the Service had designated occupied critical habitat in areas where it knew no snakes were present. By neglecting to counter this evidence, the Service left the court to conclude that the "failure to articulate a rational reason for including the areas in question within the occupied critical habitat in the face of evidence to the contrary ... was an abuse of discretion." *Id.* at 1222. In this case, no

evidence has been offered to show that the Service believed any designated Owl habitat to be anything other than occupied by the Owl or places where the Owl is "likely to occur." Accordingly, the Service's uncertainty concerning the Owl has not crossed that point alluded to by the *Home Builders I* court.

While the approach taken by the Service may not be the one that this Court would have arrived at independently, *Chevron* precludes the Court from substituting its own judgment where the agency's determination was reasonable. 467 U.S. at 844, 104 S.Ct. 2778. The Service concluded that there is a substantial likelihood that there are indeed Owls living in the challenged areas and its decision to define those areas as occupied seems more rational than the alternative—defining the areas as unoccupied in contravention of its scientifically based determination—and is reasonable.

### D. Areas Containing Fewer than All Essential Physical or Biological Features

In the Final Rule, the Service wrote that it was "including specific protected and restricted areas ... because they contain one or more [PCEs]." 69 Fed.Reg. at 53,-211; *see also id.* at 53,189. Plaintiff contends that this renders the critical habitat designation invalid because "[i]f an area is designated as critical habitat that contains fewer than all identified PCEs, then either (1) the area is not capable of serving the conservation goals of the species because essential elements to that goal are absent, or (2) the area is in fact capable of serving the species's conservation goals, in which case those PCEs that are not present are not essential to the species's conservation." (Pl.'s Reply at 9.) The Service responds that its statement "is not intended to allow the Service to designate unsuitable habitat" and that just because "one or more PCE is required to designate an area as

critical habitat, ... the mere presence of one or more of the PCEs does not qualify an area as critical habitat." (Defs.' Reply at 3–4.) Because Plaintiff fails to cite record evidence consistent with its assertions, the Court does not reach the question of whether a particular habitat can be designated in an area containing fewer that all the PCEs for that type of habitat.

Plaintiff challenges the Final Rule in hypothetical terms by suggesting that "the Service considers an area to qualify as critical habitat so long as it contains just one PCE *of any particular type of habitat.*" (Pl.'s Reply at 9.) However, it is not enough for Plaintiff to simply poke holes in the Final Rule based on conjecture. If there were some evidence that the Service had designated critical habitat in an area otherwise nonessential to Owl conservation, and justified its actions because of the presence of some isolated PCE, then the Court would address the legal question. While the Service's language clearly indicates that it believes it is legally permitted to designated habitat in areas containing "one or more" PCE, there is no evidence that it did so with respect to the Owl. As Plaintiff has not cited any record evidence to support its theory, it must fail.

### E. Critical Habitat may Require Special Management Considerations or Protection

To qualify as occupied critical habitat, a designated area must contain "physical and biological features ... which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i). Plaintiff argues that the Service has failed to comply with this requirement because it "made no such finding for each of the 52 critical habitat units .. but simply made a general finding that all units may require special management consideration or protection ... without specifying the particular considerations or protections applicable." (Pl.'s Reply at 10.) This argument

fails because it is premised on a misunderstanding of the law.

■ There is no requirement that the service make a separate determination for each of the 52 habitat units as Plaintiff demands. To illustrate this point it is necessary to examine the precise wording of the ESA. Section 1532(5)(A)(i) states that the term occupied critical habitat means:

> the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection

The wording of the statute reveals that the phrase: "which may require special management considerations or protection" solely modifies the words "physical and biological features"—not the phrase "specific areas," which appears earlier in the sentence. Accordingly, the statute does not require anything more than a finding that the physical and biological features *themselves*, not the 52 habitat units, may require special management. Indeed, a reading of the Final Rule confirms that the Service has fulfilled this lone requirement, and any specificity demanded by Plaintiff is simply unwarranted by the statutory language.

Along with its central argument, Plaintiff sets forth a number of additional arguments, all of which aim to undercut the Service's assertion that the PCEs may require special management considerations.[7] Generally, Plaintiff believes that many Owl-related management considerations existed prior to the critical habitat designation, leading it to conclude that additional special management considerations are unlikely to arise as a result of the designation of Owl critical habitat. Additionally, Plaintiff objects to the Service's reliance on past consultation activities as a predictor of the likelihood of future special management needs. In advancing these arguments, Plaintiff misses the point. The statutory criteria require only that the Service determine whether the PCEs *may* require special management considerations. Regardless of whether this renders the statutory clause "superfluous," as Plaintiff contends, it is nevertheless all that the ESA requires. The Service was well within its discretion to look to past activities to determine the likelihood of future events. Furthermore, even if the Service found a decreased need for future Section 7 consultations, this does not detract from the ultimate conclusion that the PCEs *may* need special management considerations or protection. The Court rejects Plaintiff's arguments and finds that the Service acted properly in satisfying the relatively minor legal hurdle imposed by this section of the statute.[8]

---

7. Plaintiff's argument regarding ESA Section 4(b)(2), advanced in both its Motion and Reply, warrants little discussion. There is no inconsistency between the Section 4(b)(2) exclusions and the present findings. The language quoted by Plaintiff in its brief refers exclusively to the 157 Wildland Urban Interface ("WUI") project areas and the Penasco WUI project area which were "excluded for human health and safety concerns and for the purpose of future fuel reductions." 69 Fed. Reg. at 53,220. This does not clearly support "the assertion that existing management protections are adequate." (Pl.'s Reply at 11.) Rather, it demonstrates a careful balancing between the management protections offered by critical habitat designation, and the unique risks to the public posed by designation in sensitive WUI areas. Plaintiff's contention that existing protections are adequate for all 8.6 million acres based upon the Service's treatment of the WUIs is factually unsupported and unpersuasive.

8. Both Plaintiff's Motion and Reply contain sections pertaining exclusively to the Service's alleged failure to use the best scientific data

## F. Economic Impacts

The ESA instructs the Service to designate critical habitat only "after taking into consideration the economic impact ... of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). When using this and other relevant data to inform its decision, the Service has wide discretion in determining whether to exclude particular areas. To this effect, the ESA provides that the Service "may exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat." *Id.* This discretion is limited only to the extent that the Service may not exclude areas from a designation if it determines that "failure to designate such area as critical habitat will result in the extinction of the species." *Id.*

Plaintiff contends that the Service has violated the rule set forth in *New Mexico Cattle Growers Association v. United States Fish and Wildlife Service,* 248 F.3d 1277 (10th Cir.2001), which requires that coextensive economic impacts—i.e., those impacts that result from both listing and critical habitat designation—be considered during the critical habitat designation process. In response, the Service argues that the Ninth Circuit's decision in *Gifford Pinchot,* which invalidated the Service's regulatory definition of adverse modification, seriously calls into question the continuing validity of the Tenth Circuit's logic. In its brief, however, the Service has not chosen to squarely confront the Tenth Circuit's reasoning. Instead, the Service tip-toes around the issue claiming that it has complied with the Tenth Circuit's commands while simultaneously using *Gifford Pinchot,* and other subsequent case law, to seriously undermine *New Mexico Cattle*

*Growers'* holding. For instance, the Service argues that "[i]n light of this altered regulatory scheme, *New Mexico Cattle Growers* has new import." By "new import," the Service seems to be arguing that the Tenth Circuit's decision can be molded around the subsequent rulings while leaving it partially intact. While the Service may find it easier to euphemize its attack on the Tenth Circuit's logic, this Court sees little sense in doing so. Plaintiff has premised its entire argument on the reasoning used *New Mexico Cattle Growers,* thus, the continuing validity of that opinion is properly considered by this Court.

*New Mexico Cattle Growers* involved a challenge to the economic analysis used in the critical habitat designation for the southwestern willow flycatcher. 248 F.3d at 1279–80. During the economic analysis stage, the Service considered only those costs exclusively attributable to the flycatcher's critical habitat designation. *Id.* at 1280. Any economic impacts that were also attributable to the listing of the flycatcher were excluded. *Id.* This approach, known as the baseline approach, only considers those economic impacts that would not have occurred *but for* the critical habitat designation. *Id.* The competing approach, and the one adopted by the Tenth Circuit, "take[s] into account all of the economic impact[s] of the [critical habitat designation], regardless of whether those impacts are caused co-extensively by any other agency action (such as listing) and even if those impacts would remain in the absence of the [designation]." *Id.* at 1283.

The underlying cause of this dispute was the Service's well entrenched policy of functional equivalence which, through regulatory definitions first promulgated in 1986, equated the jeopardy standard (rele-

available. (See Pl.'s Mot. at 19; Pl.'s Reply at 12–13.) The Court has already addressed and

rejected these contentions in this Order.

vant to listing) with the adverse modification standard (relevant to critical habitat designation). *See* 50 C.F.R. § 402.02; *Cape Hatteras*, 344 F.Supp.2d at 127 ("Functional equivalence is the theory that the designation of critical habitat serves a minimal additional function separate from the listing"). Section 7 of the ESA requires consultation with the Service for any action taken by a federal agency that is "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). Under the 1986 regulations, the Section 7 jeopardy standard is triggered by "an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. § 402.02. Similarly, Section 7 consultation is required when a proposed action will potentially cause " '[destruction or adverse modification]' " to critical habitat which "means a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." *Id., invalidated by Gifford Pinchot*, 378 F.3d 1059; *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 441–43 (5th Cir.2001). As is evident from the regulatory language, to trigger either jeopardy or adverse modification consultation, a proposed action must affect both "survival *and* recovery." *Id.* (emphasis added).

The result of functional equivalence was that critical habitat designations afforded identical statutory protections to occupied critical habitat as did the protections incident to listing. Thus, if an action was sufficient to trigger a Section 7 consultation under adverse modification, then it also warranted Section 7 consultation pursuant to the jeopardy standard. Consequently, where the Service designated critical occupied habitat for a species, the prevailing opinion in the Service was that there was no economic impact from the critical habitat designation because any Section 7 consultation—responsible for substantial economic costs associated with listing and critical habitat designation—was required regardless of whether critical habitat had been designated. Functional equivalence meant little or no additional protection for the listed species and contributed to "the FWS's long held policy position that [critical habitat designations] are unhelpful, duplicative, and unnecessary.' " *N.M. Cattle Growers*, 248 F.3d at 1283.

Faced with the Service's policy of using the baseline approach, the Tenth Circuit attempted to reconcile the statutory command that economic effects be considered, with the practical effect of the Service's interpretation, which commonly resulted in a finding that no economic impacts existed beyond those imposed by listing. *Id.* at 1285. The court recognized that 50 C.F.R. § 402.02's "definition of the jeopardy standard as fully encompassing the adverse modification standard renders any purported economic analysis done utilizing the baseline approach virtually meaningless." *Id.* The legality of the regulation was not before the court, and, therefore, it felt "compelled by the canons of statutory interpretation to give some effect to the congressional directive that economic impacts be considered at the time of critical habitat designation." *Id.* Thus, the Tenth Circuit concluded that "Congress intended that the FWS conduct a full analysis of all of the economic impacts of a critical habitat designation, regardless of whether those impacts are attributable co-extensively to other causes," and it invalidated the baseline approach as inconsistent with the ESA. *Id.*

Subsequent to the *New Mexico Cattle Growers* decision, the Ninth Circuit invali-

dated 50 C.F.R. § 402.02's definition of "destruction and adverse modification," as inconsistent with the recovery goal of the ESA. *Gifford Pinchot,* 378 F.3d at 1069–70. The Ninth Circuit found that the regulatory language requiring "appreciable diminish[ment] [of] the value of critical habitat for both the survival and recovery of a listed species" violated "Congress's express command" that the Service consider "the recovery goal of critical habitat." *Id.* To illustrate its point, the court wrote that "[t]he FWS could authorize the complete elimination of critical habitat necessary only for recovery, and so long as the smaller amount of critical habitat necessary for survival is not appreciably diminished, then no 'destruction or adverse modification,' as defined by the regulation, has taken place. This cannot be right." *Id.* The regulation ran afoul of the ESA primarily for use of the phrase "survival *and* recovery." By simply replacing the "and" with an "or," the recovery goal of the ESA can be met and any future action that "appreciably diminishes" recovery—regardless of any impact on survival—will necessitate Section 7 consultation. *Id.* at 1070.

As a result of *Gifford Pinchot,* the problem that the Tenth Circuit confronted—the functional equivalence of the jeopardy standard and the adverse modification standard—was eliminated. Reflecting on the Tenth Circuit's reasoning, the *Cape Hatteras* court wrote, "[a]pparently ham-

strung by its inability to consider the validity of 50 C.F.R. § 402.02, the Tenth Circuit found another way to require the Service to perform a more rigorous economic analysis. This is an instance of a hard case making bad law." 344 F.Supp.2d at 130. This Court agrees. With the revitalized definition of "adverse modification," the Service must consider recovery when consulting on critical habitat, distinguishing those consultations initiated pursuant to the jeopardy standard. Accordingly, additional economic impacts will be associated with Section 7 consultations concerning critical habitat, and the two can no longer be considered functionally equivalent.

With the *New Mexico Cattle Growers's* primary rationale undermined, the Court examines whether the Tenth Circuit's decision to embrace the coextensive approach and reject the baseline approach comports with the ESA. Having done so, this Court is unpersuaded by the court's analysis in *New Mexico Cattle Growers* and instead elects to take a different approach.[9] In following this path, the Court is not alone. *See Cape Hatteras,* 344 F.Supp.2d at 129–30 (declining to follow the Tenth Circuit in its rejection of the baseline approach); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.,* 422 F.Supp.2d 1115, 1152 (N.D.Cal.2006) (agreeing with *Cape Hatteras's* holding that "the baseline approach was both consistent with the language and purpose of the ESA and that it was a reasonable method for assessing the actual

---

**9.** This approach is not, as Plaintiff suggests, inconsistent with the Court's Order in *National Association of Home Builders v. Norton,* No. 00–CV–903, 2001 WL 1876349 (D.Ariz. Sept. 21, 2001). (See Pl.'s Mot. at 23.) Nowhere in that Order does the Court state that it is remanding the economic analysis for inconsistencies with *New Mexico Cattle Growers.* Rather, it merely indicates that the "Defendants d[id] not contest the merits of [the]

Plaintiffs' claim that the economic analysis was improper" and, therefore, the Court granted the defendants' Motion for Partial Voluntary Remand because the "Court believe[d] that broader reconsideration of the critical habitat designation [wa]s necessary." *Id.* at *2. Plaintiff's representation that this Court held otherwise is inconsistent with the language of that Order.

costs of a particular critical habitat designation").

To understand why the coextensive approach is inconsistent with the ESA, it is necessary to step back and view Congress's broader purpose in incorporating economic considerations into the critical habitat designation process. To begin with, examination of economic impacts is not permitted in the context of listing decisions. 16 U.S.C. § 1533(b)(1)(A) (requiring that listing decisions be based "solely on the basis of the best scientific and commercial data available."). Section 1533(b)(2) deals exclusively with critical habitat designation and its command to consider economic impacts is similarly constrained. Thus, to determine the economic impacts of a critical habitat designation, the Service must examine those impacts solely attributable to that decision. As stated by the D.C. District Court, "[t]o find the true cost of a designation, the world with the designation must be compared to the world without it." *Cape Hatteras*, 344 F.Supp.2d at 130. The economic impact created by a critical habitat designation is naturally the mathematical difference between those two worlds. Where a coextensive approach is taken, the Service goes beyond the command of the ESA by examining impacts that exist independent of the critical habitat designation. This only inhibits the resolution of the ultimate question—whether economic impacts suggest that exclusion of certain areas outweighs the benefits of inclusion— and confuses the real costs of making the designation. Additionally, this Court agrees that the inclusion of coextensive costs implicitly violates the ESA's disallowance of consideration of economic factors at the time of listing. Consideration of coextensive impacts simply amounts to a backhanded method of recognizing costs which could not legally be examined during listing. Finally, an expansive interpretation of "economic impacts" is contradictory to the overall purpose of the ESA, which speaks only to conservation, without regard to costs or other economic considerations. 16 U.S.C. § 1531(b).

In this case, to comply with the strictures of the ESA, the Service contracted with Industrial Economics, which prepared a report detailing the economic impacts of the proposed designation of Owl critical habitat. The Service contends that it considered coextensive impacts in the economic analysis but opted not to weigh those impacts when designating critical habitat for the Owl. According to the Service, it "did not weigh the co-extensive impacts of designating critical habitat for the Mexican spotted owl" in step two of the § 1533(b)(2) analysis. (Defs.' Reply at 4.) The baseline approach adopted by this Court does not merely require the Service to abstain from consideration of coextensive impacts in the second part of the § 1533(b)(2) requirements. Rather, more generally, it prohibits consideration of such economic impacts when deciding whether to designate habitat, which applies to all decisions made pursuant to § 1533(b)(2). *Cape Hatteras*, 344 F.Supp.2d at 130 ("The Service, however, must not allow the costs below the baseline to influence its decision to designate or not designate areas as critical habitat. That would be inconsistent with the ESA's prohibition on considering economic impacts during the species listing process."). However, using the baseline method, the Service is not prohibited from considering costs attributable to listing while studying the economic impacts of critical habitat designation, as such data may be necessary to accurately

determine the baseline. *Id.* Put plainly, the Service may not rely on economic impacts from below the baseline when either designating critical habitat or weighing exclusions from habitat, yet it may assess such information to facilitate informed decision making during those processes. *See Id.; Ctr. for Biological Diversity,* 422 F.Supp.2d at 1153. While the Service did consider coextensive impacts in the economic impacts analysis, that information was only used to establish the baseline. There is no indication that any improper economic considerations were factored into either the designation decision or the decision to exclude areas from the proposed Owl critical habitat.

Plaintiff advances three arguments challenging the Service's method for assessing economic impacts: (1) that the Service "failed to assess the designation's coextensive impacts"; (2) that it "failed to assess the impact of the designation in combination with the existing regulatory environment"; and (3) that it "failed to consider the economic effects of erroneously designating critical habitat." (Pl.'s Mot. at 21.) Inextricably enmeshed in Plaintiff's first argument is its absolute reliance on *New Mexico Cattle Growers* to support its theory that the Service failed to consider coextensive impacts. In light of the fact that the Court has chosen not to follow the Tenth Circuit's reasoning, and, conversely, has determined that coextensive economic impacts may not be considered, Plaintiff's argument fails. Next, Plaintiff analogizes the ESA with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.,* and attempts to graft NEPA's cumulative impacts analysis into the context of critical habitat designation. To accept Plaintiff's argument, this Court would have to fashion an entirely new requirement, unsupported by any ESA-related prece-

dent, simply based upon what Plaintiff believes to be sound environmental policy. The Court declines to do so. Finally, Plaintiff posits that the Service erred by failing to account for the economic costs of "erroneously designating critical habitat." For this argument to succeed, the Court must first determine that Owl critical habitat was erroneously designated. As detailed in this Order, all Owl critical habitat was designated in accordance with the requirements of the ESA, thus, Plaintiff's third argument fails.

**IT IS ORDERED** denying Plaintiff Arizona Cattle Growers' Association's Motion for Summary Judgment (Doc. 37).

**IT IS FURTHER ORDERED** granting Defendants Dirk Kempthorne, et al.'s Cross Motion for Summary Judgment (Doc. 44), and Intervenor–Defendant Center for Biological Diversity's Motion for Summary Judgment (Doc. 45).

**IT IS FURTHER ORDERED** that the Clerk of the District Court enter judgment in favor of Defendants.